UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALAN SHAWN FEINSTEIN,<br>THE ALAN SHAWN FEINSTEIN FOUNDATION,<br>THE FEINSTEIN FOUNDATION, INC.,<br>Plaintiffs,<br>v.<br><br>J. LARRY BROWN<br>Defendant. | CIVIL ACTION No. 03-0436/S |

**DEFENDANT J. LARRY BROWN'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant, J. Larry Brown moves for summary judgment under Fed. R. Civ. P. 56 on all claims asserted by Plaintiffs Alan Shawn Feinstein, the Alan Shawn Feinstein Foundation, and the Feinstein Foundation, Inc. Brown is entitled to summary judgment as a matter of law for the reasons set forth in the accompanying Defendant's Memorandum In Support Of His Motion For Summary Judgment.

Brown adopts and incorporates herein his Affidavit of J. Larry Brown, Statement of Material Facts as to Which There is No Genuine Dispute and appended exhibits, and Memorandum In Support of his Motion For Summary Judgment and Appendix of Authorities to said Memorandum.

**Request For A Hearing**

In accordance with Local Rule 12(2)(b), Defendant requests oral argument on this motion, which Defendant believes is desirable and necessary for both parties.

Dated: June 28, 2005

J. LARRY BROWN
By his attorneys,

20 Washington Place
Providence, Rhode Island 02903
401-421-3060

John H. Henn
(617) 832-1000

CERTIFICATE OF SERVICE

To:

Mark B. Morse, Esq.
111 Wayland Avenue
Providence, RI 02906

I hereby certify that I served on the above-named counsel of record a copy of the within Motion for Summary Judgment by first class mail, postage prepaid, on the ~~28th~~ 30th day of June, 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALAN SHAWN FEINSTEIN, et al.<br>Plaintiffs,<br>v.<br><br>J. LARRY BROWN<br>Defendant. | CIVIL ACTION No. 03-0436/S |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS**
**MOTION FOR SUMMARY JUDGMENT**

Defendant's ("Brown's") motion for summary judgment should be granted as to each of plaintiffs' counts against him because there is no genuine issue of material fact that:

(1) Brown's allegedly defamatory April 22, 2002 letter was privileged as well as published only to the person to whom plaintiff Alan Shawn Feinstein ("A.Feinstein") directed him to write -- Ron Gallo, and was not sent with the legally required "actual malice"; moreover, the letter was not published with the requisite level of fault and was not defamatory.

(2) that letter also did not tortiously interfere with relations between plaintiffs A.Feinstein and The Feinstein Foundation, Inc. ("Feinstein Foundation"), and the Rhode Island Foundation ("RIF"), because the letter was not written for an improper purpose or with intent to cause harm, and because RIF has both denied that its late 2003 decision to sever ties had anything to do with the April 2002 letter and asserted that other reasons caused the decision (the "last straw" being Feinstein filing this lawsuit without RIF prior knowledge); and

(3) It was plaintiffs A.Feinstein and the Alan Shawn Feinstein Foundation ("ASF Foundation"), not Brown, who breached the March 17, 2000 contract for $3 million in grants ("Contract"), because those plaintiff's excuses for not paying -- alleged failure to give A.Feinstein "naming rights" for Brown's Center on Hunger and Poverty ("Hunger Center"), alleged failure of Brown to secure direct matching funds from celebrities, and alleged failure to use all moneys raised from third parties for Contract purposes -- are each invalid. Brown did offer to name the Hunger Center for the $3 million but Feinstein had other issues he disputed with Brown; the Contract required only that the grants be marketed publicly to the Hollywood-based End Hunger Network, including use of "celebrity" appeal for media (both of which Brown did); and the Contract expressly separates the success of raising money for the Center from Feinstein's obligation to pay.

**Material Facts Not In Genuine Issue**

Background Facts

This case arises out of alleged breaches of the March 17, 2000 contract ("Contract"), and out of one of Brown's numerous communications -- an April 22, 2002 letter, seeking to have A.Feinstein and the ASF Foundation (sometimes jointly called "Feinstein") pay the $3 million in grants called for by the Contract. Defendants Statement of Material Facts ("SMF"), ¶1. The purposes of the ASF Foundation included to *"operate, be supervised and controlled by and operate for the benefit of"* the RIF. Id., ¶2.[1]

Under the Contract, the grants were to have been paid over three years starting in June 2000, of which at least $2,993,000 has never been paid. Id., ¶¶5, 7. As to the (three-page) April 22, 2002 Letter: it was sent only to Ron Gallo, who at all relevant times was president and CEO of RIF, and who was also an officer of the ASF Foundation, and during some of the relevant time an ASF Foundation board member. *Gallo was he precise person to whom Feinstein told Brown to write to concerning the payment dispute.* Id., ¶¶4, 8, 12.

1. The Defamation Claim

A.Feinstein claims that the second full paragraph of the April 22, 2002 letter defamed him by stating that he had a history of reneging on funding commitments in the sense of payments refused, payments held up, new conditions placed on payments; by identifying five institutions in Rhode Island experiencing such problems; and by stating that on more than one occasion consideration of legal action apparently induced him to fulfill his legal commitment. Id., ¶9.

*(a) Privilege*

[1] All references to a paragraph of the SMF include the exhibits cited in such paragraph, which themselves appear in the Appendix of Exhibits to the SMF.

In the late spring of summer of 2000, Gallo learned of the parties' disagreement over paying the grants and acted as an intermediary to try to work out the disagreement. Id., ¶10. Brown himself knew that the ASF Foundation had a legal or administrative relationship to the RIF. Id., ¶11; Brown Affid., ¶12. On May 31, 2001, A.Feinstein wrote to Brown, with a copy to Gallo, that any further communications on the subject should go directly to Gallo. SMF, ¶12.[2]

Brown meanwhile began to be told of Feinstein's disagreements and problems with other institutions. Specifically, Feinstein himself told Brown of a prior funding disagreement with Brown University; and Troy Earhart (a former Feinstein adviser) told Brown in late 2000 that both Johnson & Wales University ("J&W") and the Institute for International Sport ("IIS") were having problems collecting promised money from Feinstein. Brown Affid., ¶17.

Brown then made further inquiries, speaking with: (i) Troy Earhart who in August 2001 told Brown that Feinstein had funding-related problems with J&W, Providence College, University of Rhode Island ("URI"), IIS and the [Louis Feinstein] Alzheimer's Center;[3] (ii) Bernie Beaudreau (of the R.I. Community Food Bank) who in February 2002 told Brown that Feinstein had withheld timely payment of money promised to URI; (iii) Dan Doyle and Dan Berry of IIS, who in early April 2002 told Brown that Feinstein had delayed payment of money promised to them until new demands were met; and (iv) Cynthia Conant-Arp of the Alzheimer's Center who in June 2001 told Brown of what she believed was a verbal commitment of funding which Feinstein withdrew. Id.

---

[2] Feinstein on May 11, 2001 had previously advised Brown that if the ASF Foundation board did not support Brown's hunger efforts under the Contract, "any further communications will likely be through third parties only." Brown Affid., ¶13.

[3] These are the five institutions mentioned by name in the April 22 letter.

In March 2002, Brown spoke with Gallo about the funding dispute with Feinstein. Gallo said he would welcome discussions aimed at amicably resolving it, and met with Gallo on April 18, 2002. Id., ¶¶18-19. At the meeting, Brown told Gallo what he had learned about other institutions, and Gallo said he knew himself of funding issues with IIS, the Vermont Food Bank, and the International Institute of Rhode Island. Id., ¶19. At the meeting, Gallo asked Brown to write a letter to move negotiations forward, which would be used only internally within the RIF, and agreed with Brown that a draft should go to Gallo first for review and possible suggested changes. Id., ¶20; SMF, ¶¶13-14. On April 19, 2002 (Friday), Brown faxed a draft of the letter to Gallo for review, understanding that the letter was to be used only internally within RIF; Gallo reviewed it, did not say the letter was "over the top" or offer any amendments, and hoped the letter would move things "toward a positive conclusion". SMF, ¶¶15-16; Brown Affid., ¶21. In the letter Brown recited that it was written in pursuit of the RIF's and Brown's "common interest" in an amicable resolution. SMF, ¶17.

Brown's "sole motivation" in writing the letter was to collect the sums promised in the Contract, whose absence was hampering Brown's anti-hunger efforts and initiatives. Brown Affid., ¶22. Brown had no interest in harming Feinstein's reputation, which would have been counter-productive to the anti-hunger effort. Id.

Apart from the publication to Gallo, the April 22, 2002 final letter was not published elsewhere, with the exception that Brown consulted on the substance of the letter with Brandeis officials and colleagues, who consisted only of persons working for the Hunger Center and/or its fundraising. SMF, ¶19. Feinstein speculates on information and belief that the letter was published to the five Rhode Island institutions named on p. 2 of the letter, and to the Klein Foundation, Id., ¶¶18, but no FRCP 56(e)-qualifying facts support that speculation.

Gallo himself did not make the letter public, but used it only "internally within" the RIF, and never circulated it outside RIF.[4] Id., ¶20. Feinstein had admitted that his contrary speculations about publication are simply based on surmise with no first hand knowledge. Id., ¶21. There is, of course, no document supporting that surmise.

Further, Brown's "sole motive" in sending the letter was to collect the funds promised in the Contract, Brown Affid., ¶22, as opposed to any sort of ill-will or spite. Indeed, Feinstein in his first day of deposition said the Brown's motive was "to get somebody to pay the $3 million". SMF, ¶23. Nearly three weeks later, and obviously after ample time to consult with counsel, Feinstein then came up with the speculation that Brown sent the letter out of professional jealousy and testified, in response to an inquiry as to what facts support this supposition, only that "[t]hat is my belief" and "[I am] sticking to it". Id.

*(b) Lack of Actual Malice*

There is substantial overlap between the defamation-related facts pertinent to the defense of privilege and such facts related to the defense of lack of actual malice. The following undisputed facts pertain more to the latter defense, but also inform the privilege defense as well.

Feinstein admits he is a public figure. Id., ¶¶24-25. He has no Rule 56(e)-qualified evidence of actual malice (knowing or reckless disregard for the truth); indeed he has no first hand evidence at all on the subject, save his own surmise. Brown, in contrast, has ample qualified evidence, and obviously can speak first hand as to what information he had on hand as a basis for writing what he wrote, and as to his motive for doing so.

First, Brown himself made inquiries regarding each of the five institutions mentioned in his letter, expressly speaking to a former adviser of A.Feinstein (Troy Earhart), as well as several

[4] Feinstein of course made it public for the first time by attaching it to his Complaint.

others. Id., ¶26; Brown Affid., ¶17 . Feinstein, in contrast, merely speculates, without any first hand knowledge, that Brown could never have learned any negative information "[b]ecause it's not true". SMF, ¶27. However, Gallo himself during his April 18 meeting with Brown told him there were funding issues with three institutions, one mentioned in the April 22 letter -- IIS , and disagreements and side issues with others. Id., ¶28. As to IIS, Feinstein's own interrogatory answers admit that payment in full was due in May 2000 but not paid until January 25, 2001; IIS wrote a near-desperate letter in July 2000 begging for the overdue funds, and discussed possible legal action. Id., ¶¶29-32.

As to Providence College, also mentioned in the letter, Feinstein admits that a $250,000 balance remains unpaid to this date because of his claim of failures by Providence College. The full amount was due, according to the terms of Feinstein's contract with Providence college, in 1997. Id., ¶ 33. As to J&W, Mr. Feinstein stated in his interrogatory answers that by February 9, 2000, he had paid in full a $2 million dollar pledge made in 1997. In May 2001 a J&W dean wrote to Feinstein stating in part that "the present account balance, part of which is now over a year overdue, should be paid." Id., ¶ 34.

As to URI, Feinstein testified that of a $1,734,000 payment to have been made prior to December 31, 1998, only $23,318 was paid. Id., ¶35. As to the Louis Feinstein Alzheimers Center, its director testified that she believed she had a verbal commitment for funding, was surprised to learn that Feinstein was not donating the funds, and told Brown about it in June 2001. Id., ¶39. Indeed, in a draft letter to Brown written during this case and shown in draft to Feinstein, the director said "I may have admitted [to Brown] that I have heard rumors to that effect [Feinstein not fulfilling commitments]. Feinstein urged her to delete those words and not send the letter, and she complied. Id., ¶40.

The executive director of the Vermont Foodbank stated in her affidavit that "Feinstein reneged on his $10,000 commitment ... and I consulted about it with ... Bernie Beaudreau ... and Dr. J. Larry Brown". Id., ¶36. The chair of the Congressional Hunger Center wrote to Feinstein complaining about "your proposed abrogation of our three year, $100,000/year, funding agreement. Your reneging on that signed agreement represents an appalling breach of faith". Id., ¶37. Vartan Gregorian, in his affidavit, states that Feinstein was dissatisfied with Brown's not matching his annual funding at a 3:1 ration, and "wrote to Mr. Feinstein that such a ratio was not part of any formal agreement ... Feinstein requested a freeze on the expenditure of funds from quasi-endowment. The University felt that this was contrary to our agreement ... ." Id., ¶38. Brown, of course, offers this affidavit and letter evidence only to show what words were said to him, not for their truth. What matters is what Brown heard, unless it was fantastical on its face or in light of its source, which is not remotely the case here.

The April 22 Letter did not in fact defame A.Feinstein, harm his reputation or cause him damage, as confirmed by the only two identified people who either saw it for sure (Gallo) or may have seen it (McCullough). Gallo testified that he himself was a "respected member" of the Rhode Island Community (as this Court may judicially notice given Gallo's position), and that Brown's letter did "[n]ot at all" make him hold Feinstein in contempt, nor make him hate Feinstein or change his view of Feinstein at all. Id., ¶41. Norman McCullough, RIF Board Chairman at time of the letter, states that he has no memory that the letter caused him "to dislike Mr. Feinstein, hold him in contempt, or otherwise alter [his] view of [Feinstein's] reputation ... ." Id., ¶42. Furthermore, since Brown's delivery of the April 22, 2002 letter to RIF and up through the initiation of the present suit by Feinstein, only Feinstein himself has published any of the content of the letter to other parties, which Feinstein did by writing to various Rhode Island

institutions and stating that there was "an irritating rumor afloat that we have reneged on our funding commitments . . ." Id., ¶22. In August, 2003 Feinstein published the letter to the world by attaching it to his Complaint herein. App. Ex. 30.

2. The Tortious Interference Claim

In addition to the foregoing facts, RIF severed its relationship with A.Feinstein and his foundations starting in late 2003. Specifically, A.Feinstein and the foundation plaintiffs filed this lawsuit on August 28, 2003, and *thereafter* that day A. Feinstein informed Gallo and the RIF for the first time. Id., ¶43. Gallo was an officer of the ASF Foundation, and as noted (p. 2, *infra)* the ASF Foundation was to be operated, supervised and controlled *by the RIF*. Having been given no opportunity even to consult on the lawsuit before filing, the RIF board responded that same day by agreeing that the RIF relationship with Feinstein should be dissolved upon settlement of the Feinstein-Brown dispute. Id., ¶44.

Moreover, the severance of the relationship had been contemplated by RIF since *the late 1990s* because, in Gallo's words,

> "we, over the years, felt that the way Alan practices philanthropy in not in keeping with how we like to do business. There were just a number of occasions where .. the *philanthropy enterprises he engaged in or engages in we thought were questionable*.... we realized ... *further association would leave us exposed,* not just financially but in terms of image. *He was difficult to deal with as well*. ... And it became less desirable if your partner time and time again makes it difficult to, to do business together. [Id., ¶45; emphasis added.]

Feinstein's August 28, 2003 action in suing Brown (and ignoring RIF until *after* suit was filed) was, as Gallo put in, "kind of the last straw" -- that is, the "inability for us to have any impact on Alan's behavior relative to this disagreement relative to Mr. Brown. And I am sure this letter [Feinstein's notification to RIF of filing this lawsuit] only reinforced that". Id., ¶46. Learning of the lawsuit was thus the "last straw" in terms of wanting to terminate the relationship. Id.

3. The Breach of Contract Claim

A.Feinstein and the ASF Foundation claim that their failure to pay under the Contract[5] was excused by the following alleged breaches by Brown:

> "[i] failing to allow naming rights to the Center for the agreed upon consideration, [ii] failing to secure commitments for celebrity challenges as required by the terms of the aforesaid contract, and [iii] failing to secure commitments that the funds raised in connection with said campaign would be utilized for the purposes agreed to among the parties." [Id., ¶47]

*Naming*: With respect to the "naming" issue, the Contract provides that "[a]t the discretion of Feinstein, and to be determined by him, Brown's Center will be named after Alan Shawn Feinstein". Id., ¶48. The Contract itself is silent on the permanency of any use of the Feinstein name, and the Contract also provides for a three-year program of activities, not for an endowed fund (the word "endowment" appears nowhere in the Contract). SMF, ¶52. On March 13, 2001, Brown by fax outlined a proposal for the permanent bearing of A.Feinstein's name (even though the first $1 million due in 2000 had not yet been paid). SMF, ¶49. On March 29, 2001, the ASF Foundation board counter-proposed that the $3 million would only be paid as an endowment managed by the RIF and disbursed annually at only 6% -- requirements not in the Contract. SMF, ¶51.

Nonetheless, Brown on April 23, 2001 reiterated his willingness to name the Center after Feinstein pursuant to the Contract, but Feinstein testified that such willingness could not in any event revive the Contract in his view because of "a breakdown in so many aspects" of the Contract. SMF, ¶50.

*Celebrity challenges*: The term "celebrity challenge" does not appear in the Contract; rather, the Contract provides that Feinstein's grants:

---

[5] The Contract, dated March 17, 2000, appears at Appendix Ex. 1.

> "will be marketed publicly as "challenge grants" to the End Hunger Network, to be matched dollar for dollar by Feinstein… Feinstein's commitment to Brown of $1 million annually over three years, however, *is independent of and not contingent on the success of the annual efforts to match the annual Feinstein support*." SMF, ¶¶53-54. [Emphasis added]

The Contract provides in para. 3 thereof that Brown is (i) to carry out a "national campaign" as described in the attachment thereto -- entitled "Hunger Free America Action Plan"; (ii) to coordinate this campaign with, among others, the "[California] End Hunger Network" and the "Entertainment Industry Foundation"; and (iii) to "work to raise matching funds" for Feinstein's grants, and "to utilize celebrity interest and involvement *to achieve media coverage and public interest*" in ending hunger in America. (Emphasis added). The Contract says nothing about securing funding commitments from celebrities themselves to match Feinstein's grants.

The End Hunger Network ("EHN") often utilizes celebrity appeal and celebrity name-recognition to promote anti-hunger efforts. Brown Affid., ¶6. Upon execution of the Contract (but with no payments from Feinstein), Brown collaborated with both the EHN and the Entertainment Industry Foundation ("EIF"), and obtained a pledge of $3 million from Unilever/Lipton, of which the Center directly received about $500,000, with another $500,000 spent on media efforts that indirectly benefited the Center and the program under the Contract (which called for media events for the Hunger Free America program). SMF, ¶56; Brown Affid., ¶8. In addition, Brown's Center and the EHN created an entertainment celebrity-endorsed cookbook with celebrity recipes ("Cooking Up an End to Childhood in America"), which was released in 2001. Brown Affid., ¶8. Feinstein's claim (id.) that Hollywood celebrities should have been donating their own money instead of their names (and recipes) has no support in the Contract.

*Use of Funds Raised for Hunger Free America Campaign*

This claimed breach appears to be based on nothing other than that the $3 million raised from Unilever/Lipton did not all go to the Center. However, this sum was raised through the precise collaboration the Contract (in para. 3) calls for: the Center *and* the EHN *and* the EIF. SMF, ¶56. And the funds were used to support the purpose of the Contract: a hunger free America. Id. That only a third of the funds directly or indirectly benefited the Center itself does not violate any provisions of the Contract, which expressly says that Feinstein's "commitment … is independent of and not contingent on the success of the annual efforts to match". Id., ¶53.

**Argument**

I. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of Federal Rules of Civil Procedure provides that a party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When determining a motion for summary judgment, this Court must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor." Massey v. Stanley-Bostitch, Inc., 255 F. Supp. 2d 7, 9 (D. R.I. 2003) (citing Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). However, the nonmoving party "may not rest upon mere allegation or denials of his pleading." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

Evidence proffered by the nonmoving party "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Massey, 255 F. Supp. 2d at 9 (quoting Mesnick v. General Electric Co., 950 F.2d 816, 820 (1st Cir. 1991)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests

merely upon conclusory allegations, improbable inferences, *and unsupported speculation*." Id. (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990))(emphasis added). "In order to defeat a properly supported motion for summary judgment, therefore, the nonmoving party must establish a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.'" Id. at 9-10 (citing Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993)).

## II. FEINSTEIN'S DEFAMATION COUNT IS FATALLY DEFECTIVE

Feinstein's defamation count is fatally defective for three reasons. First, Brown's April 22 Letter was privileged as a communication sent in pursuit of Brown's legitimate interest (securing funding), sent in pursuit of the parties' common interest in amicable resolution of a dispute, and sent as a consented-to publication, i.e., published only to the specific person to whom Feinstein told Brown to write concerning the dispute (Ron Gallo). Second, Feinstein is a public figure and Brown's letter was not remotely sent with the legally-required element of actual malice (i.e., reckless or knowing falsity). Third, the April 22 Letter was not, as a matter of law, defamatory.

Under Rhode Island law, the elements of a defamation claim in general, and putting aside for the moment the special public figure rules, are: (i) the utterance of a false and defamatory statement concerning another, (iii) an unprivileged communication to a third party, (iii) fault amounting to *at least* negligence, and (iv) damages. Cullen v. Auclair, 809 A.2d 1107, 1110 (R.I. 2002). The third element is materially modified, however, when a public figure is the plaintiff. In that case, the "fault" that must be shown is this -- a public figure defamation plaintiff must prove, *by clear and convincing evidence*, that a false and defamatory statement "was made with 'actual malice'-- that is, with knowledge that it was false or with reckless

disregard of whether it was false or not." Cullen, 809 A.2d at 1110 (citing New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)). The record is devoid of facts that would create a genuine issue as to lack of privilege, malice or defamatory meaning.

A. The April 22 Letter was an privileged communication and Feinstein has failed to create a genuine issue otherwise.

In order to make out a prima facie case for defamation, it is *the plaintiff*, *not* the defendant, who must show that the allegedly defamatory communication was *not* privileged. Mills v. C.H.I.L.D., Inc., 837 A. 2d 714, 720 (R.I. 2003). The determination of whether a privilege exists "is exclusively legal, and is for the court, not for the jury." Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 555 (1968).

Under Rhode Island law, a publication is privileged "if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that *to speak out is necessary to protect either his own interests, or those of third persons*." Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 551 (1968)(emphasis added). A qualified privilege also exists "where the parties communicating share a common interest" in or a "reciprocity of duty" with regard to a certain subject matter. Mills 837 A. 2d at 720 (citing Ponticelli, 104 R.I. at 551). For such privilege to apply, it is sufficient that the circumstances reasonably demonstrate that the recipient had an interest in receiving the statement which corresponded with the publisher's interest in making it. Ponticelli, 104 R.I. at 551 (citing Hayden v. Hasbrouck, 34 R.I. 556, 560 (1912)). Although modern iterations of this doctrine often take place in the employment context, conditional privilege applies to wide variety of communications, including letters written to non-profit associations about its members and meetings between members of such organization to discuss internal problems. Id. at 552. The concept of conditional privilege has been interpreted liberally by

Rhode Island Courts for at least a century. See Hayden , 34 R.I. at 560 [1912]("The courts have been liberal in their view of the nature of the duty or the interest, which must exist under this rule to render a communication privileged.")

Larry Brown's April 22 Letter to Ron Gallo concerned the contractual obligations of and among A.Feinstein and the ASF Foundation, Brown and the Center, and Ron Gallo and the RIF. SMF, ¶¶14-17. The letter "was not an occasion of trifling gossip, but was a serious consultation upon a matter in which [the recipient and the publisher] were all interested . . . and upon a matter as to which they all had duties." Hayden, 34 R.I. at 561. Moreover, Feinstein himself was communicating to Brown through Ron Gallo, and had demanded that Brown do the same. SMF, ¶12. The April 22 letter was merely one in a series of communications intended to accomplish the same goal: Brown's and Gallo's (and presumably Feinstein's) "common interest" in resolving the contract dispute. SMF, ¶13, 17. Gallo was not struck out of the blue by the April 22 letter; he knew it was coming, even encouraged its publication, and he was already aware of its contents. SMF, ¶¶14-16. Gallo's prior knowledge of the subject matter of the statement renders Brown's conditional privilege even stronger in this case. See Ventetuolo v. Burke, 470 F. Supp. 887, 897 (D. R.I. 1978) (defendant was privileged to inform parties "already acquainted with the dispute" about the actions he was taking to resolve it). Under these circumstances, Brown reasonably and correctly concluded that both his interest in protecting his contractual rights, and his and Gallo's and Feinstein's common interest in resolving the contract dispute, warranted his communicating all of the information contained in the April 22 Letter to Gallo. See Nelson v. City of Cranston, 116 F. Supp. 2d 260, 268 (D. R.I. 2000) (concluding that the qualified privilege applies to an allegedly defamatory statement where the defendant "in good

faith correctly or reasonably believes" that he is making the statement in furtherance of a legitimate interest.")

Feinstein, to overcome Brown's conditional privilege to publish the April 22 letter, has the burden of showing that Brown acted with "express malice," that is, that Brown published the letter with "ill will or spite." Mills, 837 A. 2d at 720. It is immaterial that a publisher protected by a conditional privilege might have gained some "incidental gratification" from the publication. Ponticelli, 104 R.I. at 556. Once a conditional privilege is established, it can only be overcome by a showing that ill will or spite was the "*primary motivating force*" behind the publication." Id (emphasis added). Feinstein has already admitted that he understood the primary motivating force behind the publication of the April 22 Letter was Brown's desire to collect the sums he felt he was owed under the Contract. SMF, ¶23. Feinstein's subsequent, post-hoc and speculative amendment to that admission, suggesting that Brown was "jealous" of him, is not supported by the evidence, defies common sense and in any event is insufficient to overcome the conditional privilege.[6]

B. Even if the contents of the April 22 Letter were false
Feinstein has failed to show it was published with the requisite level of fault

In a defamation action brought by a private figure, the plaintiff must show "fault amounting at least to negligence on the part of the publisher." Swerdlick v. Koch, 721 A. 2d 849, 860 (R.I. 1998). But where the plaintiff is a *public figure*, and the subject of the allegedly defamatory words concern the very matter that makes him a public figure, then the plainitiff must show that the defendant knew that the statement published was false or acted in reckless

[6] To the extent that Rhode Island courts accept the proposition that a conditional privilege may also be overcome by a showing that the "statement was made with knowledge that it was false or with a reckless disregard of whether it was false or not," see Custom Auto Body, Inc. v. Aetna Casualty and Surety Co., 1983 U.S. Dist LEXIS 14941 at *52 (D. R.I. 1983), Brown relies on the next section of this memorandum, which addresses Feinstein's inability to demonstrate the requisite level of fault. See, *infra,* Section IIB.

disregard as to whether it was true or false. Lyons v. Rhode Island Public Employees Council, 516 A. 2d 1339, 1342 (R.I. 1986). That Feinstein is public figure is not in dispute. He admitted it on deposition, SMF ¶25, and his voluntary and publicity-laden "injection" of himself into funding of anti-hunger efforts, many of which bear his name, confirms it. See Quantum Electronics Corporation v. Consumers Union of United States, Inc., 881 F. Supp. 753, 762 (D. R.I. 1995) (defamation plaintiffs who voluntarily "inject" themselves into particular public spheres are classified as "limited purpose public figures.") Therefore, at a minimum Feinstein must be able to show, by clear and convincing proof, that Brown uttered a false defamatory statement with "actual malice," i.e. recklessness. Id. at 762.

Where an allegedly defamatory statement is based on information which the defendant received from others, failure to verify that information, standing alone, is not reckless. Hall v. Rogers, 490 A. 2d 502, 505 (R.I. 1985). The reckless standard requires the plaintiff to produce sufficient evidence that the defendant entertained serious doubts as to the truth of his publication or acted with a "high degree of awareness . . . of probable falsity." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). Where the source of information is apparently reliable, and the "defendant had no doubts about its accuracy," there is no malice "even if a more thorough investigation might have prevented the admitted error." Hall, 490 A. 2d at 505 (citation omitted). The label "recklessness" is reserved for information that is the product of defendant's imagination, or "based wholly on an unverified anonymous telephone call," or is "so inherently improbable that only a reckless man would have" published it. St. Amant, 390 U.S. at 732.

Here, Brown sought information about Feinstein's funding history from reliable and reasonable sources: the intended recipients of that funding, members of the charitable and educational community and even one former adviser of Feinstein. SMF, ¶26. There was and still

is no reason for Brown to disbelieve them, and Brown's own experience with Feinstein reinforced the plausibility of their information. Portions of the information were even verified by more than one source. See e.g. SMF, ¶¶25; 28-32. Feinstein has not presented a scintilla of evidence showing that Brown did not learn the information contained in the April 22 Letter from these apparently reliable and actually reliable sources, except to pronounce that he could not have learned such information because "it's not true." SMF, ¶27.[7] Even if the letter had been filled with outright falsehoods, however, Brown's conduct in writing and publishing it does not rise to the level of negligence, let alone the required finding of recklessness.

C. Feinstein cannot show that the April 22 Letter was defamatory

Brown's statement was not defamatory because it was not understood as defamatory by the only identified recipients of the letter. For a communication to be defamatory, the plaintiff must show that it imputes "conduct which injuriously affects a man's reputation, or which tends to degrade him in society or bring him into public hatred and contempt." Elias v. Youngken, 493 A. 2D 158, 161 (1985).[8]

Accordingly, the measure of whether a communication is defamatory is the reaction of third parties to whom the communication was published. The "decisive inquiry 'is what the person *to whom the communication was published reasonably understood* as the meaning intended to be expressed.'" Swerdlick, 721 A. 2d at 860 (citing Restatement (Second) of Torts § 563 (1979)(the meaning of a communication is that which the recipient "understands that it was intended to express."))(emphasis added). Even if a defendant was attempting to convey a

---

[7] We put aside for the purposes of this motion the fact that virtually every statement in the April 22 Letter already has been verified through the parties' discovery. SMF, ¶¶28-40.

[8] Whether the showing is sufficient is a matter of law for the court. Swerdlick v. Koch, 721 A. 2d 849, 859 (R.I. 1998).

defamatory meaning, "there is no defamation if the recipient does not" understand the statement in question to be defamatory. Restatement, § 563 at comment b.

The recipient of Brown's April 22 Letter was Ron Gallo. SMF, ¶15-17. The context and extrinsic circumstances of the publication are detailed above. The letter was part of an on-going effort by Gallo at resolving the Brown-Feinstein disagreement, Gallo knew in advance that the letter was coming, and Gallo reviewed its contents in draft prior to receipt of the letter in final form. Id., ¶¶12-17. Gallo himself was the source of a portion of the contents that Feinstein complains about. Id., ¶28. Not surprisingly, Gallo testified that the letter did not cause him to change his opinion of Feinstein in any way, or hate Feinstein or hold him in contempt. Id., ¶41. The only other person to offer evidence of his response to the April 22 Letter, aside from Feinstein himself, was Norman McCullough, Chairman of the Board of RIF in April 2002, who was shown the letter *by Gallo*, not by Brown, and who said that the letter did not alter his view of "Feinstein in any way, or . . . in any way cause[] me to dislike Mr. Feinstein, hold him in contempt, or otherwise alter my view of his reputation." Id., ¶42. The record further shows that the only person who actually saw the letter and interpreted it to be defamatory was Feinstein. But even Feinstein does not suggest that the letter caused *him* to hold himself in contempt or otherwise lower his view of his own reputation. Accordingly, because the only known third parties who received the April 22 Letter did not consider it to affect their views of Feinstein, the letter was not defamatory.

## II. FEINSTEIN'S TORTIOUS INTERFERENCE COUNT IS FATALLY DEFECTIVE

Feinstein's claim for "Interference with Advantageous Business Relations" similarly must fail for two reasons. First, there is no evidence that Brown published the April 22 Letter with an intent to harm for an improper purpose. Second, to the extent that Feinstein presents

*any* legally congnizable harm, that harm was not caused by Brown, nor did it result from the April 22 Letter.

In order to make out a case for intentional interference with contractual relations, the plaintiff must prove (i) the existence of a contractual relationship, (ii) knowledge by the defendant of the relationship, (iii) an intentional act of interference by the defendant, and (iv) damages resulting therefrom. Belliveau Building Corp. v. O'Coin, 763 A. 2d 622, 627 (R.I. 2000) (citing Smith Development Corp. v. Bilow Enterprises, Inc., 308 A. 2d 477, 482 (R.I. 1973)). The record is devoid of facts that would create a genuine issue as to the third and fourth elements: an intentional act of interference or damages resulting therefrom.

A. The April 22 Letter Was Not An Intentional Act Because it was not published with the Intent to do Harm for a Wrongful Purpose.

Feinstein must show that Brown's act of publishing the letter was an intentional act of interference with his contractual relations. Intent in this context requires an intent "to do harm" for an "improper" purpose or "without justification." Mesolella v. City of Providence, 508 A. 2D 661, 669-670 (R.I. 1986); Belliveau, 763 A. 2d at 628, (citing Restatement (Second) Torts § 766 (1979)). The determination of whether an act of interference is improper is based on a number of factors, including (a) the nature of the actor's conduct, (b) the actor's motive, (c) the plaintiff's interests, (d) the interests sought to be advanced by the defendant, (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. UST Corp. v. General Road Trucking Corp., 783 A. 2d 931, 937 n. 5 (R.I. 2001) (citing Restatement at §767).

Here, Brown's intent was not remotely related to a desire to do harm to any contractual relation between RIF and Feinstein. Quite the opposite. RIF, which was purporting to try to

resolve the dispute in good faith, SMF, ¶10, provided Brown with his best chance of securing his contractual rights without litigation, and harming RIF's relationship with A.Feinstein and/or any of his foundations, could only be counterproductive to that effort. Brown Affid., ¶23. Brown sent a letter at the request of a third party -- Gallo of the RIF, which was the very third party to whom Feinstein had instructed Brown to communicate, and a third party that was already aware of the letter's contents. SMF, ¶¶12-17. The record demonstrates that Brown's motive in sending the letter, well known to Gallo, was to protect his own contract rights. Brown Affid., ¶23. Brown's actions were not "improper" because he had a "financial interest" in a matter for which RIF was a key player, "and merely act[ed] to protect that interest from being prejudiced." Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co., 447 A. 2d 377, 380 (R.I. 2000) (citing Restatement (Second) Torts § 769 (1979)). In Rhode Island, acting to protect one's own financial interests is not an "improper" act that can give rise to a claim of tortious interference. Id. By contrast, Feinstein refused to deal with Brown directly, instead setting up RIF as his agent with regard to the contract dispute. SMF, ¶12.

Moreover, Feinstein's complaint does not allege that Brown's actions were "wrongful" or "improper" except by reference to the other "actions alleged herein," i.e. the defamation claim. See SMF, ¶1. Thus, with respect to the intent element of tortious interference, the defamation claim is the "only useful barometer" for judging whether Brown's actions were "improper" or wrongful. Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield, 883 F. 2d 1101, 1111 (1st Cir. R.I. 1989). Because Feinstein's defamation claim is fatally defective, the tortious interference claim must also fail. Id.

B. Harm to Feinstein's Relationship with RIF was not caused by the April 22 Letter

Proof of causation requires "either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." Mesolella, 508 A. 2D at 671 (citation omitted). It bears repeating that RIF did not even begin the process of severing its relationship with Feinstein until *after the filing of the present complaint which included the tortious interference claim.* SMF, ¶¶43-44.

Feinstein in his deposition could not point to any facts, other than his own unilateral unhappiness with RIF on unrelated matters, to support the claim that harm to his contractual relationship was caused by Brown's April 22 Letter. Indeed, common sense refutes any such claim, inasmuch as Gallo reviewed and approved a draft of the letter before it was sent. In addition, Gallo has testified that RIF had been contemplating severing its relationship with Feinstein for years *prior* to the Brown-Feinstein dispute, because Feinstein's style of "philanthropy is not in keeping with how [RIF] like[s] to do business," and because Feinstein engaged in "enterprises… [RIF] thought were questionable." SMF, ¶¶45.

Moreover, the decision by RIF to sever its relationship with Feinstein was not made upon or near to receipt by Gallo of the April 22 [2002] Letter, but instead was made on September 28, 2003, immediately after receiving notice that Feinstein had brought suit against Brown. SMF, ¶46. Gallo testified that this severance was precipitated by the "inability for [the RIF] to have any impact on [Feinstein's] behavior relative to this disagreement with Mr. Brown." Id. Feinstein's decision to sue Brown was the "last straw" for the RIF. Id. Regardless of the April 22 Letter, the relationship between RIF and Feinstein ended because it was no longer, as Gallo put it, "an affiliation of desire." Id.

## II. FEINSTEIN HAS PRESENTED NO EVIDENCE OF A CONTRACT BREACH

Except for $7,000 supposedly sent to the Center through an intermediary, neither A.Feinstein nor the ASF Foundation ever donated or proffered a single penny to the program outlined in the Contract. SMF, ¶7. Feinstein purports to excuse this breach by pointing to three supposed breaches of the contract by Brown. SMF, ¶47. As a preliminary matter, it should be noted that Feinstein has made no attempt to offer any evidence linking these alleged breaches to his decision to renege on his funding commitment to Brown. More importantly, the charged actions did not constitute breaches under any fair reading of the plain language and terms of the Contract.

Feinstein claims that Brown failed "to allow naming rights to the Center." SMF, ¶47. The record shows that Brown did offer naming rights to Feinstein. SMF, ¶¶49-50. Feinstein has responded by asserting that this did not provide for an endowment. SMF, ¶51. Feinstein also claims that he does not remember receiving Brown's final communication with the offer, but insists that it would not have made any difference in his decision not pay the money he had promised to Brown. SMF, ¶50.

The term "endowment," is not in the Contract, SMF, ¶52, and Mr. Feinstein can not conjure the term into existence through undocumented protestations of subjective intent. Weaver v. American Power Conversion Corp., 863 A. 2d 193, 200 (R.I. 2004). Where contract language is clear and unambiguous, Rhode Island courts interpret the parties' intent based solely on the written words, and the "plain and natural meaning" of those words. In Re: Newport Plaza Associates, L.P. v. Durfee Attleboro Bank, 985 F.2d 640, 645 (1st Cir. 1993).

Feinstein also complains that Brown failed to secure commitments for "celebrity challenges." SMF, ¶47. The contract provides for Feinstein's grants "to be marketed publicly by

the Center as "challenge grants" to the End Hunger Network. SMF, ¶53. It is true that the End Hunger Network is located in California, sometimes uses celebrity name recognition to call attention to anti-hunger efforts and is often referred to by Feinstein as the "Hollywood End Hunger Network." See Brown Affidavit, ¶¶5-6. None of this, however, can convert the Contract words "challenge grant" into the words "celebrity challenge" in the sense of celebrities digging into their own wallets. Feinstein, whose testimony and documents produced do not suggest any modification, rider, letter of intent, fax, e-mail, notes from a conversation or other document in support of his Contact interpretation, cannot hold Larry Brown liable for non-performance of obligations that are not in the Contract. Mr. Feinstein's pattern or practice of adding additional terms and conditions to written agreements after they have been signed, see e.g. SMF ¶¶, 31, 33, 34, 37, 38, may have been grudgingly accepted in certain eleemosynary circles, but that cannot modify the express terms of the Contract, or add new unilateral requirements.

Brown, consistent with the agreement, and *working in collaboration with the End Hunger Network*, raised three million dollars within the first year of the Contract program, of which approximately one-third directly or indirectly benefited the Center. SMF, ¶56. He also helped generate a celebrity cookbook to promote the Contract program's goals. Id., ¶55. These efforts reflect the very use of celebrities for promotional purposes that is called for by the Contract. SMF, ¶54 (quoting Contract terms). Moreover, regardless of where Brown was supposed to seek matching funds, the Contract expressly provides that "Feinstein's commitment to Brown of $1 million annually over three years . . . is independent of and not contingent on the success of the annual efforts to match." SMF, ¶ 53.

As his final excuse for non-payment, Feinstein claims that Brown failed "to secure commitments that the funds raised in connection with [the anti-hunger] campaign would be utilized for the purposes agreed to among the parties." SMF, ¶ 47. However, the Contract does not mention "securing commitments" of any kind with relation to the funding. Further, Brown has testified on personal knowledge that the money raised was in fact used to carry out the Hunger Free America program, the "program as contracted to Feinstein" and the program described in the Contact and its attachment (which describes the six components of the program). SMF, ¶56 and App.Ex. 1. Feinstein's deposition and documents provide nothing to refute this -- certainly nothing based on first-hand knowledge. To the extent Feinstein argues that all money raised in connection with the anti-hunger campaign should have gone to the Center, this reading contradicts the plain language of the Contract. The Contract lists the "various partners" with whom Brown was to work in carrying out the initiative, "including but not limited to" the "Center [], End Hunger Network, Gerda and Kurt Klein Foundation, Entertainment Industry Foundation and the Future Farmers of America" SMF, ¶ 56. In addition, the only money that was raised by Brown in connection with the anti-hunger campaign that Feinstein could be referring in his complaint was the money raised from Unilever/Lipton through working with the End Hunger Network. This is very money that Feinstein claims to be irrelevant under the Contract because it was not from an individual celebrity. SMF, ¶ 56. Because that claim, as noted above, makes no sense, the money raised was indeed used for "the purposes agreed to among the parties" -- i.e., the Hunger Free America program -- and Feinstein's third claim of breach of contract has no merit.

## Conclusion

For the foregoing reasons, this Court should grant defendant's motion for summary judgment on all counts of the complaint.

Dated: June 28, 2005

J. LARRY BROWN
By his attorneys,

Brooks Magratten
(RI License # 3585)
VETTER & WHITE
20 Washington Place
Providence, Rhode Island 02903
401-421-3060

John H. Henn
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

CERTIFICATE OF SERVICE

To:

Mark B. Morse, Esq.
111 Wayland Avenue
Providence, RI 02906

I hereby certify that I served on the above-named counsel of record a copy of the within Defendant's Memorandum in Support of His Motion for Summary Judgment by first class mail, postage prepaid, on the 30th day of June, 2005.

B3048474.1