UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALAN SHAWN FEINSTEIN,<br><br>THE ALAN SHAWN FEINSTEIN FOUNDATION,<br><br>THE FEINSTEIN FOUNDATION, INC.<br><br>Plaintiff,<br><br>v.<br><br>J. LARRY BROWN<br><br>Defendants. | CIVIL ACTION No. 03-0436/S<br><br>**AFFIDAVIT OF J. LARRY BROWN** |

I, J. Larry Brown depose and say as follows:

1. I am a resident of Massachusetts, a Professor at Brandeis University, and Executive Director of the Center on Hunger and Poverty ("Center"), which is currently located at the Heller School for Social Policy and Management at Brandeis University.

2. I established the Center in 1990 at Tufts University, based on earlier work I had led while at Harvard University, where I was chairman of the Physician Task Force on Hunger in America. The Center conducts applied research and policy analysis, disseminates analytic information on poverty and hunger, carries out public education initiatives, and provides technical assistance to policymakers and organizations across the country on poverty and hunger-related issues. In July, 2000, the Center relocated to Brandeis University.

3. I do not recall precisely when I first became aware of or met Alan Shawn Feinstein. Beginning in the early to mid-1990's, Alan and I had periodic discussions about our mutual interest in anti-hunger programs. Over several years these discussions evolved into planning for a national anti-hunger campaign.

4. On March 17, 2000, Alan and I both signed a contract (the "Contract"). Alan signed it on behalf of himself and one of his foundations, the Alan Shawn Feinstein Foundation ("ASF Foundation"). As detailed in the Contract, Alan and the ASF Foundation promised to fund, in the amount of $3 million over three years, a program entitled the "Campaign for a Hunger-Free America" (the "Program"). The Contract also provided that the money was to be paid to a non-profit institution of my choosing. I promised to oversee, direct, and carry out the components of the Program as described in the Contract.

5. Under the terms of the Contract, we were to market publicly the donations of Alan and the ASF Foundation as "challenge grants" to the End Hunger Network, a non-profit organization located in California, with whom I had a well-established prior relationship. Alan and I hoped and expected that this "challenge grant" plan would raise more money for the Program, but the Contract expressly states that Alan's grants were not contingent on the success of this fundraising challenge.

6. The End Hunger Network often utilizes celebrity appeal and celebrity name-recognition to promote anti-hunger efforts. Similarly, the Contract, and the three-year "Action Plan" appended to the Contract, contemplated the use of such "celebrity appeal" in media events, educational outreach and policy discussions. The term "celebrity **challenge**" [emphasis added] does not appear in the Contract, however.

7. At no time prior to March 17, 2000, did Alan and I agree that Alan and the ASF Foundation's payments would be in the form of an endowment, as opposed to outright grants over three years. In fact, we agreed specifically that it would not be an endowment. Alan told me on several occasions before March 17, 2000, that he didn't like endowments because of the low annual pay-out. Alan and I specifically designed the program as a three-year plan, and we correspondingly designed the payment schedule as a three-year schedule. Given the wide range of items that were intended to be accomplished as part of the three-year program, it would have been impossible to carry out the program with only an annual disbursement from an endowment of $1 million, $2 million or eventually $3 million, as endowment withdrawals typically run at 4% - 6% per year. At Tufts University, the rate was 5 % ; at Brandeis University the rate was 4-4.5 %.

8. After March 17, 2000, I sought to fulfill my obligations under the Contract by, in collaboration with the End Hunger Network and the Entertainment Industry Foundation, helping to secure a pledge of $3,000,000 from Unilever/Lipton to help carry out the component parts of the Program detailed in my agreement with Alan. Of this amount, more than half a million dollars directly supported the work of Center staff, and the remainder was used by other non-profit partner organizations to carry out the joint national campaign. The Center and I also put together state hunger coalitions in individual states; we completed this task earlier than required by the Contract. In addition, the Center and the End Hunger Network obtained celebrity endorsements and celebrity participation in a cookbook, entitled "Cooking Up an End to Childhood Hunger in America," which was released in early 2001. (Copies of excerpts from the cookbook are attached.) During the first year after we signed the Contract, I had monthly meetings

with Alan and gave him detailed reports on the Program's progress. At Alan's request, I also arranged for his son Ricky to attend organizational meetings of the End Hunger Network.

9. Around December, 2000, nearly six months after the first payment was due according to the Contract, Alan expressed dissatisfaction about several issues. This included his complaint that individual Hollywood celebrities were helping to raise corporate support rather than making personal donations as a response to the "challenge grants" that were marketed publicly as coming from Alan. In addition, Alan later adopted the position that only the establishment of an endowment, with permanent naming rights, and only at Brandeis University, would fulfill the naming terms of the agreement.

10. Although work on the program was underway, Alan and the ASF Foundation did not pay any of the grants provided for in the Contract. By April, 2001, the Center had already been forced to use other funds to pay for and carry out the component parts of the Program.

11. I attempted to negotiate with Alan to get him to pay the money, and I explained to him that I had been carrying out my part of the bargain. Alan and the ASF Foundation still did not pay any money to the Center.

12. After signing the Contract, I became aware of the Rhode Island Foundation's ("RIF's") relationship to the ASF Foundation. Ron Gallo, the Chief Executive Officer of RIF, tried to negotiate a resolution of the disagreement between myself and Alan. At times, Ron asked me to write letters explaining my position, describing the progress of the program and the work of the Center, in order to help move the discussions forward. Ron's efforts only resulted in new demands from Alan that went beyond the terms of our original

agreement, such as making each installment of the grant conditional on Alan's personal prior approval.

13. In his letter to me of May 11, 2001, Alan informed me that at an upcoming board meeting, he would "try and convince" the other board members to support the Program. He informed me that "if the results" of the board meeting are not to my liking, "any further communication will likely be through third parties only."

14. On May 29, 2001, after the board meeting of the ASF Foundation, Ron Gallo informed me that at the board meeting Alan declared that the Contract was invalid, so the board referred the matter to RIF's legal counsel.

15. The next day, May 30, 2001, Alan sent a fax to me which stated that the board was "taking the matter under advisement" and that any "**further communication about this matter should go direct to [Ron Gallo]**." (Emphasis added)

16. On June 6, 2001, on behalf of Alan and the ASF Foundation, Ron Gallo wrote to me, and in resolution of the dispute offered a single grant to the Center of $150,000, in lieu of the $3 million provided for in the Contract. I responded to Ron and declined this offer.

17. At or near this time, I was told about Alan's disagreements and problems with other non-profit and educational institutions. Alan himself had told me of his prior disagreement with Brown University over funding. Troy Earhart, once an adviser to Alan, told me in late 2000 that both Johnson & Wales University ("J & W") and the Institute for International Sport were having similar problems collecting money promised by Alan. He also told me about Alan's dissatisfaction with the University of Rhode Island ("URI"). I decided to find out more about how these other institutions handled their situations in order to try to reach a resolution. Among the people I spoke with were:

a. Troy Earhart, who, in August, 2001, told me more about the institutions that had funding-related problems with Alan, including, by name, J&W, Providence College, URI, the International Institution for Sport and the Alzheimer's Center. This was one of several communications I had with Troy during this period.

b. Bernie Beaudreau of the Rhode Island Community Food Bank, who I spoke with on several occasions, and who told me February, 2002, that Alan had withheld timely payment of money promised to URI, and only paid after considerable efforts by the URI administration.

c. Dan Doyle and Dan Barry of the Institute for International Sport, with whom I spoke in early April, 2002, and who told me that Alan had delayed payment of money promised to them under a written agreement until his new demands, which were not part of their original agreement, were met.

d. Cynthia Conant-Arp of the Louis Feinstein Alzheimer's Center ("Alzheimer's Center"), who, in June, 2001, told me that Alan had made some funding commitment to her center and then withdrew it. I later learned, after this litigation had commenced, that the commitment Alan had made was verbal.

18. In March, 2002, Ron Gallo and I spoke again. Ron informed me that he had discussed the matter of the Contract further with Lew Feldstein, Chief Executive Officer of the New Hampshire Charitable Trust and a mutual associate of Ron and myself. Ron said that he would welcome further discussions about how we could bring this matter to an amicable resolution.

19. Ron and I met at the Hope Club in Providence on April 18, 2002. During that meeting, I told Ron what I had learned about Alan's problems with other institutions in meeting his

funding commitments. Ron told me that he knew of funding disputes between Alan and the Vermont Food Bank, the International Institute of Rhode Island, and the Institute for
commitments between Mr. Feinstein and additional institutions.

20. Ron and I discussed the appropriate next steps to take. We ultimately agreed that I would write a letter to RIF that, among other things, would outline the history of my difficulties with Alan and the ASF Foundation. Ron told me that the letter would only be used for purposes internal to RIF. We also agreed that I would send Ron a draft informally before sending the final version, so he could review it and suggest changes before showing it to other board members at RIF.

21. On April 19, 2002, I faxed a draft of the letter to Ron. He left me a voice mail on April 22, 2002, to tell me that the letter looked good and that he had no changes to suggest. Subsequently, I faxed Ron a note confirming his voice mail, and then I re-sent the final letter to him via overnight mail.

22. My sole motivation in writing this letter was to collect the sums promised by Alan and the ASF Foundation in the Contract. I have devoted my professional life to anti-hunger efforts and initiatives, and Alan's failure to live up to his commitment was and still is hampering the effectiveness of these efforts and initiatives. I had and have no interest in harming Alan's reputation, which could have been counter-productive to my anti-hunger efforts.

23. During our April 18, 2002, meeting, Ron and I specifically discussed that my writing the letter, and our ultimately resolving the dispute, could help to preserve the relationship between RIF and Alan, and that it was in our common interest to resolve the matter

quickly and without litigation. My intent in writing the letter, and my intent in general during this entire affair, has never included harming the relationship between Alan, or any of his foundations, and RIF. My only goal was to get the money due under the Contract without having to sue. For some time up to this point, the only realistic hope I had of achieving that goal was through the intercession of RIF and the good offices of Ron Gallo.

24. Aside from sending the letter to the RIF, showing it to or discussing its contents with two or three employees at Brandeis University who had a direct interest in Center funding, and of course later providing copies to my attorneys in connection with this case, I have not disclosed or "published" the letter to anyone.

J. Larry Brown

Dated: June 9, 2005

Commonwealth of Massachusetts

Then personally appeared the-named J. Larry Brown, before me this day, and made oath that the foregoing statements were true and correct.

6/9, 2005

Notary Public

My commission expires 11/19/2010

LEANNA ANDRESIAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
November 19, 2010

CERTIFICATE OF SERVICE

To:

Mark B. Morse, Esq.
111 Wayland Avenue
Providence, RI 02906

I hereby certify that I served on the above-named counsel of record a copy of the within Affidavit of J. Larry Brown by first class mail, postage prepaid, on the 30th day of June, 2005.

[signature]