UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ALAN SHAWN FEINSTEIN,
THE FEINSTEIN FOUNDATION, and
ALAN SHAWN FEINSTEIN FOUNDATION

VS. CA NO.: 03-0436S

J. LARRY BROWN; Alias

**PLAINTIFFS' OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now come the Plaintiffs and hereby object to Defendant's Motion for Summary Judgment. In support of their objection Plaintiffs have attached a Memorandum of Law, and a Contested Statement of Facts with Exhibits and Affidavits appended thereto.

Plaintiffs respectfully request that oral argument be granted in consideration of their objection.

**Plaintiffs**
ALAN SHAWN FEINSTEIN
ALAN SHAWN FEINSTEIN
FOUNDATION and
THE FEINSTEIN FOUNDATION,
INC.
By their attorneys,
Law Office of Mark B. Morse

MARK B. MORSE
RI Bar Reg No 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555
fax (401) 273-0937

**CERTIFICATION**

To: John Henn, Esq.
Foley & Hoag, LLP
155 Seaport Boulevard
Boston, MA 02108
FedEx

Brooks Magratten, Esq.
Vetter & White
20 Washington Place
Providence, RI 02903
Hand Deliver

I hereby certify that I mailed a true copy of the within to the above named.

DATE: 8·1 05

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ALAN SHAWN FEINSTEIN,
THE FEINSTEIN FOUNDATION, and
ALAN SHAWN FEINSTEIN FOUNDATION

VS. CA NO.: 03-0436S

J. LARRY BROWN; Alias

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs
ALAN SHAWN FEINSTEIN
ALAN SHAWN FEINSTEIN
FOUNDATION and
THE FEINSTEIN FOUNDATION,
INC.
By their attorneys,
Law Office of Mark B. Morse

MARK B. MORSE
RI Bar Reg No 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555
fax (401) 273-0937

# TABLE OF CONTENTS

Table of Authorities i

I. FACTS AND TRAVEL 1

II. ISSUES 6

III. STANDARD OF REVIEW 6

IV. ARGUMENT 7

*A.* *Genuine Issues of Material Fact Exist As to Defendant's Performance Under the March 17, 2000 Contract.* 7

*B.* *Genuine Issues of Material Fact Exist As to Whether the April 22, 2002 Publication Was Libelous.* 12-13

*C.* *There Are Genuine Issues of Material Fact That Defendant Intentionally Interfered With Contractual Relationship Between Plaintiffs and The Rhode Island Foundation.* 22

V. CONCLUSION 29

# TABLE OF AUTHORITIES


| Cases | Page(s) |
|---|---|
| *Abraham v. Graphic Arts Intern. Union*, 660 F.2d 811 (D.C. Cir. 1981) | 6 |
| *A. C. Beals Co. v. Rhode Island Hosp.*, 292 A.2d 865 (R.I. 1972) | 9 |
| *Antonio Marcaccio, Inc. v. Santurri*, 155 A. 571 (R.I. 1931) | 9 |
| *Belliveau Building Corp. v. O'Coin*, 763 A.2d 622 (R.I. 2000) | 22, 24, 25 |
| *Belliveau v. Rerick*, 504 A.2d 1360 (R.I. 1986) | 20 |
| *Capuano v. Outlet Co.*, 579 A.2d 469 (R.I. 1990) | 17 |
| *Custom Auto Body, Inc. v. Aetna Casualty and Surety Co.*, 1983 WL 1873 (D.R.I. 1983) | 6, 7 |
| *DiBiasio v. Brown & Sharpe Manufacturing Co.*, 525 A.2d 489 (R.I. 1987) | 23 |
| *Exxon Corp. v. Federal Trade Comm'n*, 663 F.2d 120 (D.C.Cir. 1980) | 6 |
| *Federal Auto Body Works, Inc. v. Aetna Casualty & Surety*, 447 A.2d 377 (R.I. 1982) | 23, 24 |
| *Filippi v. Filippi*, 818 A.2d. 608 (R.I. 2003) | 11 |
| *Fryzel v. Domestic Credit Corp.*, 385 A.2d 663 (R.I. 1978) | 9, 10 |
| *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) | 17 |
| *Hayden v. Hasbrouck*, 84 A. 1087 (R.I. 1912) | 20 |
| *Herbert v. Lando*, 441 U.S. 153 (1979) | 17 |
| *Hidden Brook Air, Inc. v. Thabet Aviation Intern. Inc.*, 241 F.Supp.2d 246 (S.D.N.Y. 2002) | 23 |
| *Major v. Drapeau*, 507 A.2d 938 (R.I. 1986) | 17 |
| *Marks v. Struble*, 347 F.Supp.2d 136 (D.N.J. 2004) | 23 |
| *McKnight v. Hasbrouck*, 20 A. 95 (R.I. 1890) | 20 |
| *Mesolella v. City of Providence*, 508 A.2d 661 (R.I. 1986) | 27 |

*Mihalik v. Duprey*, 417 N.E.2d 1238 (Mass.App.Ct. 1981) 16, 19

*Mills v. C.H.I.L.D.*, 837 A.2d 714 (R.I. 2003) 19, 20

*Nassa v. Hook-Superx, Inc.*, 790 A.2d 368 (R.I. 2002) 22

*Nelson v. City of Cranston*, 116 F.Supp.2d 260 (D.R.I. 2000) 20

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) 17

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) 13

*Ponticelli v. Mine Safety Appliance Co.*, 247 A.2d 303 (R.I. 1968) 20, 21

*Quantum Electronics Corp. v. Consumers Union of United States, Inc.*, 881 F.Supp. 753 (D.R.I. 1995) 13

*Russolino v. A. F. Rotelli & Sons*, 128 A.2d 337 (R.I. 1957) 9, 10

*Schoff v. York County*, 761 A.2d 869 (Me. 2000) 16, 19

*Sebastian Intern., Inc. v. Russolillo*, 162 F.Supp.2d 1198 (C.D.Cal. 2001) 23

*Swanson v. Speidel Corp.*, 293 A.2d 307 (R.I. 1972) 20, 21

*Tele-Port, Inc. v. Ameritech Mobile Comm., Inc.*, 49 F.Supp.2d 1089 (E.D. Wis. 1999) 23

*URI Cogeneration Partners, L.P. v. Board of Governors for Higher Ed.*, 915 F.Supp. 1267 (D.R.I.1996) 24

*UST Corp v. General Road Trucking Corp.*, 783 A.2d 931 (R.I. 2001) 25

*Western Mass. Blasting Corp. v. Metropolitan Property and Casualty Insurance Co.*, 783 A.2d 398 (R.I. 2001) 25

*Zifcak v. Monroe*, 249 A.2d 893 (R.I. 1969) 9

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ALAN SHAWN FEINSTEIN,
THE FEINSTEIN FOUNDATION, and
ALAN SHAWN FEINSTEIN FOUNDATION

VS. CA NO.: 03-0436S

J. LARRY BROWN, Alias

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I. FACTS AND TRAVEL

Throughout his adult life, Plaintiff Alan Shawn Feinstein ("ASF") has devoted himself to philanthropic causes, primarily that to alleviating hunger through the world, and furthering community service among our youth. Since 1996, these devotions have been his exclusive pursuit, channeled through a private foundation, The Feinstein Foundation, and from 1993 until March 31, 2004, through public foundations established as supporting organizations of the Rhode Island Foundation. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.**[1] Plaintiff, The Alan Shawn Feinstein Foundation ("ASF Foundation"), through March 31, 2004, was one of the two supporting organizations to the Rhode Island Foundation ("RIF").

The Feinstein supporting organizations were two of only four foundations ever established as supporting organizations to RIF. **Plaintiffs' Ex. 9: Ron Gallo Depo at 12**. Whereas RIF had a number of donor directed funds established for the donor to direct funding to specified types of endeavors, the four supporting organizations of RIF had separate Board of

[1] Reference to "Plaintiffs' Exhibit Nos." are those exhibits contained in Plaintiffs' Statement of Contested Facts and Appendix of Exhibits. Reference to "Defendant's Exhibit Nos." are likewise those contained in Defendant's Statement of Material Facts to Which There is No Genuine Dispute and Appendix of Exhibits.

Directors, and were allowed more leeway in establishing how funds were to be distributed. The Feinstein supporting organizations were unique among the RIF funds in that ASF was allowed to invade the principal to direct funding to a particular recipient. **Plaintiffs' Ex 9: Ron Gallo Depo at 21-22. See also Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.**

ASF's philanthropy was multiplied through use of the Feinstein Challenges. The Feinstein Challenges are renown for their success in raising money for anti-hunger programs, and have been responsible for raising hundreds of millions of dollars for participating charitable organizations. **Defendant's Ex. 17: Alan Shawn Feinstein's Answers to Ints. #21.** The success of the Feinstein Challenges led to the relationship that is the subject matter of the dispute now before the Court.

The defendant, J. Larry Brown is director of what was formerly known as the Center for Hunger and Poverty, an academic center established initially at Tufts University, and most recently, since June, 2000, affiliated with Brandeis University. Defendant had affiliations with a film industry group known as the End Hunger Network. The End Hunger Network is an anti-hunger group which counts among its membership a number of movie stars and persons well know in the film industry.

In the months prior to March 17, 2000, Defendant approached ASF in hopes of enticing ASF to support the Center for Hunger and Poverty. Defendant told ASF of his connections to the End Hunger Network, and how he could enhance the visibility of the Feinstein Challenges through the participation of the Hollywood film industry. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.**

On March 17, 2000, the parties entered into a contract which is a subject of this lawsuit. The document was prepared by Defendant, and presented to ASF for his review and signature. **Plaintiffs' Ex. 12: J. Larry Brown Depo at 6-7.**

The contract provided for ASF to pledge three (3) one million ($1,000,000.00) dollar challenge grants which were to be marketed to the End Hunger Network, "to be matched dollar for dollar by the Center as challenge grants," and to be paid annually commencing June 1, 2000, and continuing on the first of June in each successive year. In return, Defendant proposed a program entitled the Campaign For a Hunger-Free America, which consisted of a number of projects designed to raise the visibility of anti-hunger programs, and to encourage participation in a nationwide end hunger campaign. Defendant pledged that"[a]t the discretion of Feinstein, and to be determined by him, Brown's Center will be named after Alan Shawn Feinstein [e.g. 'Feinstein Center on Hunger and Poverty]. Any other name associated with the Center shall require the concurrence of both Feinstein and Brown." **Defendant's Ex. 1: March 17, 2000 Agreement.**

In June, 2000, Defendant and Tufts University parted ways. The Center for Hunger and Poverty was transferred by Defendant to Brandeis University. In anticipation of the same, Defendant requested that the first one million dollar payment be delayed, so that Defendant could apply it to the newly affiliated Center at Brandeis. **Plaintiffs' Ex. 14: J. Larry Brown Depo at 56-62.** At about the same time, Defendant entered into an employment contract with Brandeis University that provided, *inter alia*, that "naming rights for the Center will be within the control of Brandeis University." **Plaintiffs' Ex. 18: John Shonkoff Depo at 38 with attached Brandeis/ Brown Contract.**

As early as June, 2000, discord resulted among the parties. **Plaintiffs' Ex. 9: Ron Gallo Depo at 37.** Defendant admitted to ASF that the celebrity challenge envisioned by the parties was not going to happen. **Plaintiffs' Ex. 14: J. Larry Brown Depo at 101-02.** Naming rights to the Center would not occur without a minimum five million ($5,000,000.00) dollar pledge, the minimum funding commitment required by Brandeis University for a Center to be named in

perpetuity. **Plaintiffs' Ex. 18: John Shonkoff Depo at 41.**

ASF immediately expressed his dissatisfaction. **Plaintiffs' Ex. 14: J. Larry Brown Depo at 101-02.** In response, Defendant proposed alternative means to fulfill his obligations under the contract. He sought to meet the requirements of the Celebrity Challenge through partial remittance of a large corporate contribution secured by the End Hunger Network. He offered naming rights to the Center for a limited duration, reserving the name in perpetuity only upon payment of the five million ($5,000,000.00) dollars required by Brandeis. **Plaintiffs' Ex. 23.**

In December, 2000, Defendant began another tact. Knowing of the unique relationship that existed between ASF and RIF, Defendant approached RIF to pressure ASF to pay the three million ($3,000,000.00) dollars, notwithstanding Defendant's failure to comply wit the specific terms of the Agreement. **Plaintiffs' Ex. 24.** Rhode Island Foundation conducted a series of meetings in an attempt to bring the parties closer together. **Plaintiffs' Ex. 9: Ron Gallo Depo at 42.** Plaintiff ASF was not invited, and was neither made aware of the meetings, nor was he told of the substance of the meetings. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.**

Defendant wrote to RIF. On June 6, 2001, the Rhode Island Foundation Director, Ronald Gallo, wrote to Defendant indicating that its legal counsel had found the Agreement to be null and void due to the Defendant's noncompliance, and offered an alternative plan in compromise of all claims. **Plaintiffs' Ex. 25.** Defendant refused the compromised offer. **Plaintiffs' Ex. 26.**

At an April 18, 2002 meeting between Ronald Gallo and Defendant, Defendant asked whether he could write a letter for Mr. Gallo to review, setting forth his position concerning the March 17, 2000 agreement. **Plaintiffs' Ex. 11: Ron Gallo Depo at 307.** The letter was faxed to Mr. Gallo the following day. **Plaintiffs' Ex. 17: J. Larry Brown Depo at 354.** Mr. Gallo

did not offer any amendments to the letter. **Plaintiffs' Ex. 10: Ron Gallo Depo at 249.** As a result, the letter was mailed by Defendant to Ron Gallo on April 22, 2002. The letter stated in part:

> We have learned, for. example, that Alan Shawn Feinstein apparently has a history of making funding commitments and then reneging on them. In speaking to relevant parties involved, we are aware that the circumstances sometimes vary (payment refused altogether, subsequent payments held up or canceled and new conditions or demands placed on the recipient organization that were not contained in the original agreement). But all instances,together demonstrate an apparent pattern of reneging on written agreements. We believe that this pattern pertains to organizations both outside and within Rhode Island, and that it includes at least the following in your state: University of Rhode Island, Johnson and Wales, Providence College, Institute for International Sport, and the LewIs Feinstein Alzheimer's Center. Additionally, we are informed that on more than one occasion the consideration of legal action was the only thing that apparently induced Alan to finally fulfill the legal commitments that he bad made.

**Defendant's Ex. 2: April 22, 2002 Correspondence.**

Shortly after the letter was published to RIF, the unique relationship that existed between ASF, The Feinstein Foundation, and RIF began to deteriorate. On August 12, 2003, Defendant, through counsel, wrote again to RIF requesting immediate attention to payment of three million ($3,000,000.00) dollars. **Plaintiffs' Ex. 27: August 12, 2003 Correspondence to RIF.** A copy of the letter was forwarded to ASF. As a result of these actions, ASF informed RIF that he had authorized legal action against Defendant. **Defendant's Ex. 28: August 28, 2003 ASF Correspondence to RIF.** On August 28, 2003, RIF's Board officially voted to disaffiliate from the Feinstein supporting organizations. **Defendant's Ex. 29: August 29, 2003 Minutes of RIF Board Meeting.**

On September 2, 2003, ASF commenced the within lawsuit in Providence County Superior Court. Defendant filed suit in federal court for the District of Massachusetts, removed

the within case to federal court, then sought dismissal of Plaintiffs' claims on the grounds that he had first filed its lawsuit in federal court. The Court denied Defendant's motion, causing the case to be dismissed in Massachusetts.

Plaintiffs' Complaint sounds in three counts. Count I alleges libel based upon the April 22, 2002 publication. In Count II plaintiffs allege that defendant committed an intentional interference between the plaintiffs and the Rhode Island Foundation. Count III alleges that Defendant breached his contract with plaintiffs. Defendant counterclaimed seeking a declaratory judgment that there was no libel or interference with contract, and that Plaintiff was in breach.

II. ISSUES

A. Whether Genuine Issues of Material Fact Exist Regarding the Defendant's Compliance With the Terms of the Agreement.

B. Whether There Are Genuine Issues of Material Fact That the April 22, 2002 Publication by Defendant Was Defamatory.

C. Whether There Are Genuine Issues of Material Fact That Defendant Intentionally Interfered With Contractual Relationship Between Plaintiffs and The Rhode Island Foundation.

III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, this Court must determine whether there exists any genuine issues of material fact, FRCP 56(c). For purposes of the motion, all facts should be construed in favor of the nonmoving party. *Abraham v. Graphic Arts Intern. Union*, 660 F.2d 811, 814 (D.C. Cir. 1981); *Exxon Corp. v. Federal Trade Comm'n*, 663 F.2d 120, 126 (D.C.Cir. 1980). "The party seeking summary judgment has the burden of affirmatively demonstrating that there is no genuine issue of fact on every material issue raised by the pleadings." *Custom Auto Body, Inc. v. Aetna Casualty and Surety Co.*, 1983 WL 1873, at *3

(D.R.I. 1983). The First Circuit deems summary judgment inappropriate where there exists the "slightest doubt" as to any material fact. *Id.*

IV. ARGUMENT

*A. Genuine Issues of Material Fact Exist As to Defendant's Performance Under the March 17, 2000 Contract.*

The March 17, 2000 contract has 14 numbered paragraphs. **Defendant's Ex. 1.** The contract was prepared by Defendant, who believed each of the terms was material. **Plaintiff's Ex. 14: J. Larry Brown Depo at 81.**

Genuine issues of material fact exist concerning Defendant's performance under a number of the terms of the contract. For example, the third bullet of Paragraph 3 provides that "J. Larry Brown agrees to: Work to raise matching funding for Feinstein's annual challenge grants, and to utilize celebrity interest and involvement to achieve media coverage and public interest in ending hunger in America." **Defendant's Ex. 1.**

Defendant claims that his obligation to raise matching funding for Feinstein's annual challenge grants did not require him to obtain the matching grants from individual celebrities. Defendant claims he fulfilled his obligation by obtaining $500,000.00 of a three million dollar corporate grant obtained by the End Hunger Network.

Defendant's interpretation is inconsistent with the understanding of the parties. From its inception, the parties understood that ASF was drawn to Defendant's purported ability to attract celebrities to meet the challenge posted by Plaintiffs. **Plaintiffs' Ex. 28: J. Larry Brown Depo at 209-10 and 224-25 with attached documents.** Whereas, Defendant conveniently "does not recall" specific discussions about the celebrity challenges before the execution of the contract, Plaintiff ASF, and others with first hand knowledge, do have such specific recollections. **Compare Plaintiffs' Ex. 13: J. Larry Brown Depo at 22-26 with Plaintiffs' Ex. 1: Alan**

**Shawn Feinstein Aff; Plaintiffs' Ex. 2: Edward Walton Aff; Plaintiffs' Ex. 3: Thomas Zammarelli Aff.** ASF hoped to increase awareness of hunger issues by posting his challenge to celebrities. Defendant understood his obligation was to secure the participation of the celebrities to the challenge. He admitted as much to ASF, and to others. **Plaintiffs' Ex. 2: Edward Walton Aff; Plaintiffs' Ex. 4: Edward Valenti Aff; Plaintiffs' Ex. 5: Bernard Beaudreau Aff.**

The words "celebrity challenge," though not specifically mentioned in the body of the contract, are alluded to in two parts of the contract. First, in the same paragraph three, the contract refers "to utilize celebrity interest and involvement to achieve media coverage and public interest in ending hunger in America." No particulars are provided as to what is meant by this paragraph. At least one of the parties understood this to mean celebrity challenges. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.** Defendant, on the other hand refused to take a position as to how the plan to utilize celebrity interest would be implemented, other than to rely on the specific language of the contract. **Plaintiffs' Ex. 13: J. Larry Brown Depo at 23.** Conversely, Defendant admits that the celebrity challenges were the subject of ongoing discussions before the contract was signed. **Plaintiffs' Ex. 13: J. Larry Brown Depo at 30, 43.** The meaning of the words are not inconsistent with plaintiff ASF's interpretation of this as the celebrity challenges envisioned by the parties.

The second indication that the contract contemplated celebrity challenges is contained in paragraph six of Defendant's Exhibit 1. In paragraph six, Feinstein pledges three (3) grants of one $1 million ($1,000,000.00) dollars each: "The grants will be marketed publicly by the Center as 'challenge grants' to the End Hunger Network." Defendant described The End Hunger Network to Plaintiff as a group which consisted of Hollywood celebrities to whom the challenge would be marketed. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.** This reference to the End

Hunger Network is not inconsistent with ASF's belief that the challenges would be marketed to the celebrities who comprised the End Hunger Network.

The best that can be said about these terms are that they are ambiguous. To the extent that the documents are ambiguous, the ambiguity ought to be construed against Defendant, the maker of the contract. *Fryzel v. Domestic Credit Corp.*, 385 A.2d 663, 666-67 (R.I. 1978); *A. C. Beals Co. v. Rhode Island Hosp.*, 292 A.2d 865, 872 (R.I. 1972); *Zifcak v. Monroe*, 249 A.2d 893, 896 (R.I. 1969); *Russolino v. A. F. Rotelli & Sons*, 128 A.2d 337, 340 (R.I. 1957); *Antonio Marcaccio, Inc. v. Santurri*, 155 A. 571, 572 (R.I. 1931). At the very least, the ambiguity creates an issue to be resolved by the trier of fact. *Fryzel*, 385 A.2d at 666; *Geary*, 204 A.2d 302, 305 (R.I. 1964); *Russolino*, 128 A.2d at 340.

A second area of the contract in which defendant was in substantial noncompliance is set forth in paragraph 10 of Defendant's Exhibit 1. Paragraph 10 provides:

> At the discretion of Feinstein, and to be determined by him, Brown's Center will be named after Alan Shawn Feinstein [e.g. "Feinstein Center on Hunger and Poverty"]. Any other name associated with the Center shall require the concurrence of both Feinstein and Brown. Such naming opportunity shall remain available to Feinstein whether or not Brown's program remains at Tufts University or moves to another non-profit institution, to be decided by Brown.

**Defendant's Ex. 1 ¶ 10.**

As early as June 2, 2000, Defendant recognized that he could not fulfill this aspect of the contract. In contravention of Paragraph 10, Defendant entered into an employment contract with Brandeis University in which he agreed that the naming of the Center " be mutually determined by Brown and the Dean of the Heller School, subject to the approval of the Provost and Senior Vice-President for Academic Affairs." **Plaintiffs' Ex. 29: Employment Contract Between J. Larry Brown and Brandeis University.** At that time, and continuing through all

relevant periods, Brandeis required a minimum of five million dollars for its institutions' naming rights in perpetuity. **Plaintiffs' Ex. 18: John Shonkoff Depo at 41.** John Shonkoff, Dean of the Heller School at Brandeis University, stated that he knew of the naming opportunities provided to Mr. Feinstein in the March 17 contract, and discussed with Defendant Brandeis's policy of requiring a minimum five million ($5,000,000.00) dollars for permanent naming rights. **Plaintiffs' Ex. 18: John Shonkoff Depo at 40-41.**

Defendant hopes to circumvent this issue by suggesting that the naming rights afforded to Mr. Feinstein were meant to be something less than permanent. Unless otherwise stated in the document, the practice among the institutions are that naming rights to a Center are *always* permanent. **Plaintiffs' Ex. 6: Samuel Babbitt Aff; Plaintiffs' Ex. 7: Joseph Goldblatt Aff.**

A number of alternatives were proposed to provide Mr. Feinstein with naming rights to comply with this provision of the Agreement. In sum, each of the proposals required payment by Plaintiffs of five million ($5,000,000.00) dollars for Mr. Feinstein to be allowed permanent naming rights. **See, e.g., Plaintiffs' Ex. 30: Communication Among Brandeis University, J. Larry Brown and Plaintiff ASF Regarding Naming Rights.**

Plaintiffs contend that Defendant's failure to allow permanent naming rights is a breach of the contract. At the very least, it presents a genuine issue of material fact necessary to be resolved by the factfinder at trial. *Fryzel*, 385 A.2d at 666; *Geary*, 204 A.2d at 305; *Russolino*, 128 A.2d at 340.

Important to consideration of whether the contract was fulfilled by the Defendant is the issue of donative intent. It is a prerequisite among institutional recipients of philanthropic grants that the intent of the donor be given primary consideration, so long as it is consistent with the mission of the recipient organization. **Plaintiffs' Ex. 6: Samuel Babbitt Aff; Plaintiffs' Ex. 7: Joseph Goldblatt Aff; Plaintiffs' Ex. 5: Bernard Beaudreau Aff; Plaintiffs' Ex. 19:**

**Paul Witham (URI) Depo at 96-97; Plaintiffs' Ex. 20: Dan Barry (Intrntl Sports) Depo at 88.** In the instant matter, Plaintiffs' intent was to support the Center for Hunger and Poverty in return for naming rights and the Defendant coordinating a Celebrity Challenge, among other things. At the very least, genuine issues of material fact are raised as to whether Defendant had any hope or intention of fulfilling the intent of the donor.

Other issues of Defendant's noncompliance with the terms of the contract exist. There is no evidence that the six component parts specified in Paragraph 4 ever came to fruition. No Children's March ever took place. Likewise, no Ring Around Congress ever took place. **Plaintiffs' Ex. 17: J. Larry Brown Depo at 332-33.**

The Feinstein Hunger Brigade, which became the subject of a separate contract with the Klein Foundation, collapsed after Mr. Feinstein fully met his $250,000.00 commitment to the Klein Foundation. The collapse occurred largely as a result of Defendant's intercession in that contract, and his insistence that The Feinstein Hunger Brigade required a constant inflow of money if it was to continue to exist under Mr. Feinstein's name. **Plaintiffs' Ex. 31: J. Larry Brown Depo. at 158-75 and Correspondence Among Defendant, ASF and The Klein Foundation Regarding The Klein Foundation Contract.**

Finally, defendant misconstrues the nature of the contract in issue. The contract is one for a charitable grant to Defendant. Rhode Island law provides that a promise to make a charitable donation is enforceable only to the extent that the promissee relied, to his detriment, on the promise. Rhode Island law require a clear and unambiguous promise, reasonable and justifiable reliance upon the promise, and detriment to the promissee, caused by his or her reliance on the promise. *Filippi v. Filippi,* 818 A.2d. 608, 626 (R.I. 2003).

First, the promise is not clear and unambiguous. It is dependent on performance by the Defendant of certain obligations. Although Plaintiffs' funding commitment "is independent, and

not contingent on the success of the annual efforts to match the annual Feinstein support," **Defendant's Ex. 1 at ¶ 6**, the Agreement does not excuse Defendant from not procuring any support for the challenge. The plain meaning of the language presupposes that a Challenge Grant will be issued, and that Plaintiffs will match the challenge with three $1 million grants, regardless of the outcome. The challenge was never issued. Defendant thought the challenge was inappropriate, and too "crass" to be brought to the attention of certain of the celebrities with whom he had contact. **Plaintiffs' Ex. 16: J. Larry Brown Depo at 223-24.**

Second, Defendant cannot claim reasonable and justifiable reliance on the promise. Defendant knew that his agreement with Plaintiffs was in jeopardy within the first few months of its execution. **Plaintiffs' Ex. 13: J. Larry Brown Depo at 26.** He knew that issues about his noncompliance cropped up almost immediately. On June 2, 2000 he executed a contract with Brandeis that put into question his ability to perform under the contract. As of April 10, 2000 he knew that there was not going to be a celebrity challenge. **Plaintiffs' Ex. 32: J. Larry Brown Depo. at 221, 223, 232 with attachment.**

Defendant admits that he knew of ASF's dissatisfaction as early as December 19, 2000. **Plaintiffs' Ex. 17: J. Larry Brown Depo. at 339-41.** As of December 19, 2000 there remained a question of when the first payment under the March 17, 2000 Agreement was due, since the initial payment was delayed by Defendant for an indeterminate period. **Plaintiffs' Ex. 14: J. Larry Brown Depo. at 56-62.** Accordingly, the extent to which defendant can claim reasonable and justifiable reliance on the terms of the March 17, 2000 Agreement remains a genuine issue of material fact.

For the foregoing reasons, plaintiff's motion for summary judgment as to Count III should be denied.

*B. Genuine Issues of Material Fact Exist As to Whether the April 22, 2002 Publication*

*Was Libelous.*

Defendant's failure to meet his obligations, and his failed attempts to induce Plaintiff to commit two million dollars more than required under the March 17, 2000 Agreement led to his reckless publication of defamatory material to the Director of the Rhode Island Foundation. The letter, published as a draft on April 19, 2002, and re-submitted on April 22, 2002, stated in pertinent part:

> We have learned, for example, that Alan Shawn Feinstein apparently has a history of making funding commitments and then reneging on them. In speaking to relevant parties involved, we are aware that the circumstances sometimes vary (payment refused altogether, subsequent payments held up or canceled and new conditions or demands placed on the recipient organization that were not contained in the original agreement). But all instances,together demonstrate an apparent pattern of reneging on written agreements. We believe that this pattern pertains to organizations both outside and within Rhode Island, and that it includes at least the following in your state: University of Rhode Island, Johnson and Wales, Providence College, Institute for International Sport, and the LewIs Feinstein Alzheimer's Center. Additionally, we are informed that on more than one occasion the consideration of legal action was the only thing that apparently induced Alan to finally fulfill the legal commitments that he had made.

**Defendant's Ex. 2: April 22, 2002 Correspondence.**

The first step necessary for Plaintiff to establish that he has been libeled is that the statements were untruthful. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Quantum Electronics Corp. v. Consumers Union of United States, Inc.*, 881 F.Supp. 753, 766 (D.R.I. 1995). Each of the statements set forth above is untrue. Alan Shawn Feinstein does not have a history of making funding commitments and reneging on them. No competent evidence has been offered by the defendant to that effect.

Of the institutions named by Defendant in the April 22 letter, each has refuted that Plaintiff ever reneged on a commitment to them. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.**

**See Plaintiffs' Ex. 19: Paul Witham's (URI) Depo at 47-48; Plaintiffs' Ex. 21: Vincent Saele (Johnson & Wales) Depo at 77, 80-87 and attached Correspondence from Thomas Wright; Plaintiffs' Ex. 8: Joseph Brum( Providence College) Aff; Plaintiffs' Ex. 20: Dan Barry's (Inst. for Intrntnl. Sports) Depo at 84 and attached Correspondence from Dan Doyle; Plaintiffs' Ex. 22: Cynthia Conant-Arp's (Louis Feinstein Alzheimer's Center) Depo at 42-43.** Likewise, the following statements are untrue:

> In speaking to relevant parties involved, we are aware that the circumstances sometimes vary (payment refused altogether, subsequent payments held up or canceled and new conditions or demands placed on the recipient organization that were not contained in the original agreement). But all instances, together demonstrate an apparent pattern of reneging on written agreements. We believe that this pattern pertains to organizations both outside and within Rhode Island, and that it includes at least the following in your state: University of Rhode Island, Johnson and Wales, Providence College, Institute for International Sport, and the LewIs Feinstein Alzheimer's Center.

**Defendant's Ex. 2: April 22, 2002 Correspondence.**

Defendant cites various people as his sources for these allegations. **Defendant's Ex. 3: J. Larry Brown Aff. at ¶ 17.** First cited is Plaintiff Alan Shawn Feinstein, who is alleged to have told Defendant of problems he had with Brown University. Other than having had those discussions, there is nothing in Defendant's Affidavit, or in the record, that Plaintiff Alan Shawn Feinstein stated anything to Defendant remotely resembling allegations that ASF reneged on his contracts, imposed new terms, or otherwise committed the acts alleged by Defendant. Rather, Plaintiff expressed disappointment that Brown University never truly committed to the anti-hunger program established by ASF. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff. and attached August 29, 1999 Correspondence.**

The second source listed by Defendant is Troy Earhart, who allegedly told Defendant that ASF was having problems with Johnson & Wales and the Institute for International Sports.

**Defendant's Ex. 3: J. Larry Brown Aff. at ¶ 17.** No affidavit executed by Troy Earhart has been presented in support of this contention. In fact, at his deposition, Defendant could not remember what Troy Earhart told him, but stated that the information could be found in the documents provided by Defendant in response to Plaintiff's request for production of documents. **Plaintiff's Ex. 17: J. Larry Brown Depo at 377.** The only documents that exist to support Defendant's contention that Troy Earhart was a source of information is contained in telephone logs prepared by Defendant. Defendant has produced no writing from Troy Earhart supporting Defendant's contention that Mr. Earhart said the things alleged by Defendant. Defendant's support that Troy Earhart was a source of information who told Defendant this disinformation rests upon Defendant's bare allegations only.

As to other sources of information, Defendant names Bernard Beaudreau who allegedly told Defendant that ASF withheld money from URI. **Defendant's Ex. 3: J. Larry Brown Aff. at ¶ 17.** Bernard Beaudreau denies that he ever told Defendant this information. **Plaintiff's Ex. 5: Bernard Beaudreau Aff.**

Dan Doyle and Dan Barry are listed as other sources of information. Dan Barry admits to having spoken with Defendant. He claims, however, that Defendant misconstrued his statements. **Plaintiff's Ex. 20: Dan Barry Depo at 89.** In fact, Mr. Barry stated that ASF fulfilled all his commitments, even if not on time. **Id. at 6.** Mr. Barry cites as the reason for the untimely payments was the Institute for Sports failure to do the things they said they would do. **Id. at 24-25, 85-87.**

A further source of information listed by Defendant is Cynthia Conant-Arp, current Director of the Hope Alzheimer's Center. **Defendant's Ex. 3: J. Larry Brown Aff. at ¶ 17.** Cynthia Conant Arp testified that it was her own misunderstanding that led to her think that ASF did not comply with his obligations. She stated that she told this to Defendant before he

published the April 22, 2002 letter. **Plaintiffs' Ex. 22: Cynthia Conant-Arp Depo at 37.** She further stated that Defendant's recollection of the conversation that he had with her contained falsehoods, and was inaccurate. **Id. at 36-37, 51-53.** Cynthia Conant-Arp stated that Plaintiff was never in breach of his obligations to The Hope Alzheimer's Center (formerly known as the Louis Feinstein Center). **Id. at 42-43.**

It is one thing for Defendant to claim that Plaintiff ASF reneges on contracts in that he does not make timely payments. The information is incomplete, however, when the full story is not told; that is, that the payments were not timely because of a failure of the recipient to fulfill its own obligations. Defendant cannot rely on incomplete information and partial truths to support his allegations that the statements published are true. *Schoff v. York County*, 761 A.2d 869, 872 (Me. 2000) (citing *Toney v. WCCO Television, Midwest Cable and Satellite, Inc.*, 85 F.3d 383, 387, 392, 395 (8th Cir. 1996); *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978)); *Mihalik v. Duprey*, 417 N.E.2d 1238, 1239 (Mass.App.Ct. 1981) ("[A] 'half truth [is] tantamount to a falsehood.'"). A defendant may not "omit[] other true information which if stated would dispel the defamatory sting, or phrase[] and arrange[] . . . true statements in such a way as to give them a false and defamatory meaning." *Schoff*, 761 A.2d at 872.

The next untrue statement by Defendant is the statement that: "Additionally, we are informed that on more than one occasion the consideration of legal action was the only thing that apparently induced Alan to finally fulfill the legal commitments that he had made." The closest support for this statement is from Dan Barry who, in his deposition, stated that the International Inst. for Sports internally discussed whether legal action should be contemplated. **Plaintiffs' Ex. 20: Dan Barry Depo at 67.**

There is no evidence that Plaintiff was ever made aware of threats of legal action. Thus, to the extent that legal action was contemplated, it certainly was never a consideration that

"induced plaintiff ASF to fulfill his legal commitments." The statement is untrue.

Plaintiff Alan Shawn Feinstein is admittedly a public figure. In order to establish a claim for libel, plaintiff must show that the defendant acted with actual malice in publishing the defamatory material. Actual malice means either that the defendant knew the statements were false when made or that the defendant acted with a reckless disregard as to whether or not the statements were false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *Herbert v. Lando*, 441 U.S. 153, 156 (1979); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974); *Capuano v. Outlet Co.*, 579 A.2d 469, 472 (R.I. 1990); *Major v. Drapeau*, 507 A.2d 938, 940 (R.I. 1986).

In order to show a reckless disregard, plaintiff must prove more than that the defendant was merely careless or negligent in making the statements. Plaintiff must prove that the defendant acted with a high degree of awareness that the statement was probably false and/or that defendant entertained serious doubt as to the truthfulness of the statement, but still elected to publish the statement. Determining whether a person acted with reckless disregard of the falsity of a statement involves a subjective standard and not an objective standard. *Herbert*, 441 U.S. at 154, 156, 160; *Gertz*, 418 U.S. at 334 n.6. The plaintiff must prove that this particular defendant knew or should have known that the statements were probably untrue or that he had serious doubts that the statements were probably untrue or that he had serious doubts that the statements were true. The plaintiff must prove that the defendant nevertheless elected to make the statements. *See Sullivan*, 376 U.S. at 280; *Herbert*, 441 U.S. at 156; *Gertz*, 418 U.S. at 334; *Capuano*, 579 A.2d at 472; *Major*, 507 A.2d at 940.

That Defendant knew the statements were false is evident. Each of the named institutions, through depositions or affidavit, states that the information presented to Defendant was later distorted or taken out of context. **See Plaintiffs' Ex. 19: Paul Witham's (URI) Depo**

**at 47-48; Plaintiffs' Ex. 21: Vincent Saele (Johnson & Wales) Depo at 77, 80-87 and attached Correspondence from Thomas Wright; Plaintiffs' Ex. 8: Joseph Brum (Providence College) Aff; Plaintiffs' Ex. 20: Dan Barry's (Inst. for Intrntnl. Sports) Depo at p. 84 and attached Correspondence from Dan Doyle; Plaintiffs' Ex. 22: Cynthia Conant-Arp's (Louis Feinstein Alzheimer's Center) Depo at 42-43.**

Two additional affidavits offered by Defendant are likewise unable to withstand close scrutiny. In the first of the two, Vartan Gregorian provides an affidavit that is based on a select sampling of the documents submitted by Brown University in response to Defendant's subpoena. In sum total, Dr. Gregorian alleges that the World Hunger Program endowed by plaintiff Alan Shawn Feinstein fell apart because ASF could not reach an agreement on program objectives or as to ASF's role as the major donor funding the program.

The Affidavit submitted by Defendant is only one part of the story known to Defendant. The package of materials, viewed in total, indicate that plaintiff ASF was never in breach of obligations to Brown University. Rather, the relationship ended when ASF and Brown University could not come to terms on a subsequent donation offered by ASF after ASF fulfilled his original obligation to Brown University. **Plaintiffs' Ex. 6: Samuel Babbitt Aff. and Attached Correspondence.** The documents attached to Dr. Babbitt's affidavit are known to Defendant and were produced by Brown University in response to a subpoena issued by Defendant. Taken as a whole, the Brown University documentation falls far short of the allegation that plaintiff ASF has a "history of making funding commitments and then reneging on them." The statements made by Dr. Gregorian are fully explained through an examination of the file submitted by Brown University in response to Defendant's subpoena.

The second new affidavit submitted by Defendant to support his contention that plaintiff "has a history of making funding commitments and then reneging on them" is that of Deborah

Flateman of the Vermont Food Bank. By the terms of the Affidavit, Ms. Flateman admits that she did not obtain the 20,000 signatures necessary to participate in the Challenge. **Defendant's Ex. 4: Deborah Flateman Aff. at ¶ 4.** Ms. Flateman's affidavit indicates nothing more than her disappointment in failing to meet the specifications of the Challenge. What she has failed to say is that, it was she who offered to obtain the 20,000 signatures, and that her criticism of plaintiff to Ron Gallo of the Rhode Island Foundation was roundly rebuked by Mr. Gallo. **Plaintiffs' Ex. 1: Alan Shawn Feinstein Aff.**

It is not mere supposition that plaintiff ASF voiced when he stated that Defendant knew that the information he gathered was untrue because the ideas attributed to the sources had never been said or were taken out of context. Every source cited by Defendant for which additional evidence has been adduced has stated that Defendant either took words out of context or significantly altered what was told to him. Defendant cannot rely on half truths and phrases taken out of context to support his claim that he was unaware of the falsity of the statements. *See, e.g.*, *Schoff*, 761 A.2d at 872; *Mihalik*, 417 N.E.2d at 1239. Accordingly, the question of whether Defendant knew of the falsity of the statements made should be reserved for the trier of fact.

Defendant claims that, even if defamatory, he had a qualified privilege to write the statements because they were published to protect his own business interests to a restricted group at the Rhode Island Foundation. Defendant misstates the scope of the available privilege. A qualified privilege exists only if "the publisher makes the statements in good faith and 'reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect his own interests, or those of third person[s],'" *Mills v. C.H.I.L.D.*, 837 A.2d 714, 720 (R.I. 2003) (quoting *Ponticelli v. Mine Safety Appliance Co.*, 247 A.2d 303, 305-06 (R.I. 1968)), or "when the parties communicating share a common interest." *Id.* The

communication is privileged only where "the recipient's knowledge of the defamatory matter will be of service in the lawful protection of that interest." *Id.*

Under Rhode Island law, defamatory statements have been held conditionally privileged where such statements were made (1) intra-organizationally or (2) in the employment context. *See Swanson v. Speidel Corp.*, 293 A.2d 307, 309-10 (R.I. 1972); *Ponticelli*, 247 A.2d 303, 306 (R.I. 1968); *see also Mills*, 837 A.2d 714, 720 (R.I. 2003) (intra-organizational); *DiBiasio v. Brown & Sharpe Manufacturing Co.*, 525 A.2d 489, 491-92 (R.I. 1987) (intra-company and between employers); *Belliveau v. Rerick*, 504 A.2d 1360, 360-61 (R.I. 1986) (intra-departmental); *Hayden v. Hasbrouck*, 84 A. 1087, 1088 (R.I. 1912) (intra-organizational); *McKnight v. Hasbrouck*, 20 A. 95, 95-96 (R.I. 1890) (same); *Nelson v. City of Cranston*, 116 F.Supp.2d 260, 268 (D.R.I. 2000) (employment context). The letter published by Defendant to The Rhode Island Foundation was neither intra-organizational, nor was it in an employment context. Even ASF's May 30, 2001 directive that "further communication about this matter should go direct to them (Ron Gallo)" does not transform an otherwise unprivileged communication into a privileged one. **Defendant's Ex. 18.** Defendant had already taken it upon himself to openly communication with Ron Gallo long before the time ASF had directed further inquiries to Ron Gallo. **Plaintiffs' Ex. 24.** Moreover, it was Ron Gallo, not ASF, who authorized communication between Brown and himself as representative of RIF, not as an agent of ASF. **Plaintiffs Ex. 1: Alan Shawn Feinstein Aff. at ¶ 6.**

Even were he able to claim such a privilege, it is overcome by evidence of malice. In this context, malice is the publisher's ill will or spite. *Mills*, 837 A.2d at 720. Evidence of ill will or spite exists in the record. Examples are as follows:

- As early as 1999 evidence existed that Defendant minimized and criticized Plaintiff ASF's effort in the field of anti hunger. **Plaintiffs' Ex. 1: Alan Shawn**

**Feinstein Aff. with attached August 29, 1999 Correspondence.**

- Just two months after the Agreement was signed, and before any payment would be due, Defendant faxed remarks to Beth Reisboard of the Klein Foundation dated 5/17/00, that Defendant met with Alan Shawn Feinstein... "probably for the rest of my *hopefully short life*" (emphasis in original). **Plaintiffs' Ex. 33: J. Larry Brown Depo at 419 with attached May 17, 2000 email to Beth Reisboard, Klein Foundation;**

- Defendant, at various times has referred to plaintiff ASF as " a piece of work" **Plaintiffs' Ex. 34: J. Larry Brown Depo at 337 with attached November 6, 2000 Correspondence to Jack Shonkoff, Brandeis University;**

- Defendant faxed remarks to Beth Reisboard dated 5/9/01, about being unable to guarantee that ASF would "fulfill his original promise for the funding he said he would give" (the second half of the funding commitment was not due until June 1, 2001; the first half had been paid in a timely fashion) **Plaintiffs' Ex. 35: J. Larry Brown Depo p 423 with attached May 9, 2001 email to Beth Reisboard, Klein Foundation;** and

- Defendant faxed remarks to Beth Reisboard dated 6/18/01, stating that ASF was "[e]everything we always say he is, and I think you should shoot the person who hooked you up with him in the first place!" **Plaintiffs' Ex. 36: J. Larry Brown Depo at 186-87 with attached June 18, 2001 email to Beth Reisboard, Klein Foundation.**

Defendant contends that his "sole motivation" in writing the letter was to collect the three million ($3,000,000.00) dollars. He relies on nothing more than his own testimony to support his claim that he is without malice. The above statements indicate otherwise.

It may very well be that Defendant's statement served a dual purpose: to obtain the three million ($3,000,000.00) dollar funding on the one hand, and, on the other hand, to disparage the work of a rival participant in anti-hunger works. Which sentiment was the more predominant is an issue to be resolved by the trier of fact. *Swanson*, 293 A.2d at 311; *Ponticelli*, 247 A.2d at 308. There is certainly sufficient contrary evidence to challenge Defendant's self serving statement to warrant that the issue be presented to the factfinder for determination.

Finally, Defendant has presented excerpts of the deposition of Ron Gallo and the affidavit of Norman McCulloch to support his contention that there can be no libel because it had no effect on what the recipient felt about plaintiff ASF. **Defendant's Ex. 14: Ron Gallo Depo at 253-54; Defendant's Ex. 6: Norman McCulloch Aff.** The effect that Defendant's statements may have had on the recipients is of no consequence. The statements published by Defendant are libel *per se*. "'One who publishes a slander that ascribes to another conduct...that would adversely affect his fitness for the proper conduct of his lawful business ... is subject to liability without proof of special harm.'" *Nassa v. Hook-Superx, Inc.*, 790 A.2d 368, 374 (R.I. 2002) (citing Restatement (Second) of Torts § 573 at 191-92 (1977)). The statements are actionable without proof of special damages. Damages are presumed. *Id.*

For the foregoing reasons, Defendant's Motion for Summary Judgment as to Count I should be denied. Genuine issues of material fact exist as to whether Defendant properly investigated the allegations knowing them to be false, or in reckless disregard of their truth or falsity.

C. *There Are Genuine Issues of Material Fact That Defendant Intentionally Interfered With Contractual Relationship Between Plaintiffs and The Rhode Island Foundation.*

Defendant claims no responsibility for the dissolution of the relationship between the plaintiffs, Alan Shawn Feinstein and The Feinstein Foundation, and The Rhode Island Foundation. To establish a tortious interference with business relations plaintiffs must establish: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. *Belliveau Building Corp. v. O'Coin* 763 A.2d 622, 627 (R.I. 2000) (citing *Smith Development Corp. v. Bilow Enterprises, Inc.*, 308 A.2d 477, 482 (R.I. 1973)).

In this case, the contract existed between Alan Shawn Feinstein, The Feinstein Foundation, and The Rhode Island Foundation. **Plaintiffs' Ex: 1: Alan Shawn Feinstein Aff.** The relationship between the plaintiffs and RIF was unique and had existed for at least ten years before the Defendant's interference. **Plaintiffs' Ex. 9: Ron Gallo Depo at 13-14**; **Plaintiffs' Ex: 1: Alan Shawn Feinstein Aff.**

Defendant admits knowledge of the relationship. **Plaintiffs' Ex. 17: J. Larry Brown Depo at 366-67.** Proof that Defendant possessed knowledge of the precise terms of the relationship is unnecessary; Plaintiff mpust simply establish that Defendant had "[k]nowledge of facts that would lead a reasonable person to believe that . . . a contractual relationship exist[ed]." - *DiBiasio*, 525 A.2d at 493 (citing Prosser & Keeton, The Law of Torts § 129 at 982)); *Marks v. Struble*, 347 F.Supp.2d 136, 146 (D.N.J. 2004); *Hidden Brook Air, Inc. v. Thabet Aviation Intern. Inc.*, 241 F.Supp.2d 246, 279 (S.D.N.Y. 2002); *Sebastian Intern., Inc. v. Russolillo*, 162 F.Supp.2d 1198, 1203 (C.D.Cal. 2001); *Tele-Port, Inc. v. Ameritech Mobile Comm., Inc.*, 49 F.Supp.2d 1089, 1092 (E.D. Wis. 1999).

Plaintiffs claim, as the primary source of interference, the April 22, 2002 communication from Defendant to RIF. Defendant attempts to justify the April 22 communication, claiming there was no interference because he was directed to further communicate with RIF by the plaintiff. **Defendant's Ex. 18.** Defendant's reliance is misplaced. Plaintiff's directive that future communication should be with RIF does not grant Defendant a privilege to communicate information that is unnecessary to protect his own interests. *See Federal Auto Body Works, Inc. v. Aetna Casualty & Surety*, 447 A.2d 377, 380 (R.I. 1982). To the extent that Defendant can rely on Plaintiff's directive, he can go only so far as is necessary to protect his own interests. Likewise, Defendant cannot justify his interference on any supposed invitation from Ron Gallo of the RI Foundation. The details of that invitation are in issue. According to Ron Gallo,

Defendant asked whether he could write to the Rhode Island Foundation, and whether Mr. Gallo would review the contents of the letter. Mr. Gallo did not initiate the correspondence. **Plaintiffs' Ex. 11: Ron Gallo Depo at 307.** Mr. Gallo never told Defendant what to write, nor did he corroborate essential allegations in the writing. **Plaintiffs' Ex. 11: Ron Gallo Depo at 305-06.** In any event, Mr. Gallo would have no authority to sanction an otherwise improper communication. *See Federal Auto Body*, 447 A.2d at 380.

Defendant argues that he was not acting improperly since he was protecting his financial interests. He states therefore, there can be no tortious interference. His argument has no basis under Rhode Island law. In *Federal Auto Body*, the Court determined that an interference is proper only if "one has a financial interest in the business of the third person and merely acts to protect that interest from being prejudiced by the relation without employing wrongful means." 447 A.2d at 380. Defendant has no financial interest in the business of the Rhode Island Foundation. To the extent that he does have an interest in the business of the Rhode Island Foundation, Defendant used wrongful means to protect that interest by overstepping the boundaries of what was necessary to protect his interests.

Even if the contents of the April 22 letter proves to be non-defamatory, that in itself does not insulate Defendant from liability from an interference claim. Contrary to Defendant's argument, an interference claim does not require the plaintiff to establish that the Defendant engaged in a falsehood or otherwise committed any independent tortious conduct. Instead, Plaintiffs need only establish that Defendant intentionally interfered with a third party, caused harm in doing so, and that the defendant acted without justification. *Belliveau*, 763 A.2d at 628. Defendant must establish that his interference was justified. *Id.* at 627; *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Ed.*, 915 F.Supp. 1267, 1289 (D.R.I. 1996).

Even assuming Brown's interest was justified, any such privilege is conditional only, and

can be overcome by a showing of "actual malice," or "spite or ill will." *Western Mass. Blasting Corp. v. Metropolitan Property and Casualty Insurance Co.*, 783 A.2d 398, 402 (R.I. 2001); *Belliveau*, 763 A.2d at 627. In this case, there is plenty of evidence of Brown's "spite or ill will" toward Feinstein. **Plaintiffs' Ex. 37: J. Larry Brown Depo at 186-87, 337, 419-20 with attached May 17, 2000 email to Beth Reisboard, Klein Foundation.**

A number of factors can be considered to determine whether an interference ought to be considered unjustified. The *Belliveau* Court suggested these factors should include:

> (1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interests with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship."

763 A.2d at 629 n.3.

Consideration of the factors are fact-specific, and the relevance of each will vary on a case-by-case basis. *UST Corp v. General Road Trucking Corp.*, 783 A.2d 931, 937 (R.I. 2001). In the instant matter, the first two factors are certainly relevant. The actor's conduct in impugning Plaintiff ASF's character can be considered and measured against what he hoped to accomplish by such statements. The fact-finder would be able to consider whether the remarks were necessary to accomplish what the Defendant perceived to be Plaintiffs' non-compliance with the March 17, 2000 Agreement.

The Defendant's motive, as argued earlier, remains to be determined. Despite his protest, there is record evidence that Defendant's correspondence may have been activated by professional jealousy, or ill will toward Plaintiff. *Supra*, pp. 21-22.

The contractual interests interfered with, and the societal interests protected, are of great

significance. The relationship between plaintiffs and the Rhode Island Foundation were of tremendous importance, and benefited the general public substantially.

The interests sought to be advanced by the Defendant are laudatory, but must be balanced against his inability to comply with essential terms of the contract. Striking the right balance is a consideration which ought to be left to the trier of fact.

In determining the balance of social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff, the Court should note that the March 17, 2000 Agreement was a philanthropic gesture of the Plaintiffs. As such, the Plaintiffs donative intent ought to be weighed strongly against the Defendant's actions, even if the primary motive of the Defendant is found to be enforcement of the Agreement.

The Defendant's conduct is in close relationship to the interference complained of. As noted *infra*, the Plaintiffs' and RIF enjoyed a close relationship which contemplated many more years of good service to the public. The Defendant's unwarranted publication put a quick end to the relationship.

The parties' relationship is an issue of significance. Although plaintiff Alan Shawn Feinstein Foundation was a party to the Agreement, its Board was autonomous from that of RIF. Additionally, Plaintiffs, ASF and The Feinstein Foundation had further relationships with RIF that became implicated by Defendant's interference.

In all, the factors to be weighed present a fact intensive analysis which should be deferred until a trial on the merits so that all material facts can be analyzed and weighed. For this reason, consideration of whether Defendant's actions were justified is premature.

The final issue to be resolved is the extent to which the interference affected the relationship between plaintiffs and RIF. Defendant posits two arguments as to why Defendant's letter did not cause the termination of the relationship between Plaintiffs and RIF. First,

Defendant alleges that it was Plaintiffs' filing of the lawsuit that led to the termination of the relationship. Second, Defendant contends that the relationship between plaintiffs and RIF was already on a path to dissolution. For the foregoing reasons, both these contentions are very much at issue.

Defendant relies on Mr. Gallo's testimony at one point that Plaintiffs' lawsuit was "the last straw" that led to the demise of the relationship. **Defendant's Ex. 13: Ron Gallo Depo at 141-43.** At the same time though, Mr. Gallo testifies that he can't say for sure that notice of the lawsuit by plaintiffs "was an absolute cause and effect" since the issue had been discussed for some time. **Id. at 141.** Furthermore, Mr. Gallo states, as noted in Defendant's Statement of Material Facts ¶ 46, that the last straw was "the whole disagreement, but also the inability for us to have any impact in Alan's behavior relative to this disagreement with Mr. Brown. And I'm sure this letter only reinforces that."

Not cited by Defendant is Mr. Gallo's testimony that:

- "the issue between Mr. Brown and Mr. Feinstein played a significant role [in the termination of the Feinstein/RIF relationship]. But I'd see it more as the last straw than the first." **Plaintiffs' Ex. 9: Ron Gallo Depo at 107.**

- "As I know I testified previously , this was, the Larry Brown situation exacerbated or the tensions had already existed. I think I called it the last straw. So it, it, it definitely had a role." ... and how Mr. Feinstein handled the dispute."

**Plaintiffs' Ex. 11: Ron Gallo Depo at 314.**

For Defendant to simply conclude that the lawsuit, rather than the letter, caused the rift in the relationship is an oversimplification, and subject to dispute. As Defendant aptly noted in his brief, "proof of causation requires that '. . . but for the interference there would have been a relationship.'" *Mesolella v. City of Providence*, 508 A.2d 661, 671 (R.I. 1986). There is sufficient evidence for a factfinder to conclude that the discord that developed between the

Plaintiffs and Defendant, and the resultant April 22, 2002 letter, was the precipating cause of the termination of the relationship between RIF and Plaintiffs.

Second, Defendant contends that RIF and Plaintiffs' relationship was on the verge of dissolution prior to any involvement by Defendant. As authority, Defendant refers to Ron Gallo's statements to that effect. **Defendant's Exs. 13 & 14.**

Aspects of the relationship between plaintiffs and RIF contradict these statements. In fact, prior to Defendant's interference, the relationship between plaintiffs and Defendant could not have been stronger. Consider the following:

- there were no unresolved issues between ASF and The Rhode Island Foundation with potential donees (other than Defendant's relationship);
- there were no instances when ASF requested that RIF hold up funding to a potential donee;
- The RIF contemplated featuring the school program sponsored by ASF in its publication;
- The RIF contemplated featuring ASF's photo in its lobby;
- The RIF contemplated notifying other state public foundations of the ASF Hunger Challenge; and
- The RIF contemplated linking itself to the ASF website.

**Plaintiffs' Ex. 11: Ron Gallo Depo at 313-14.**

Mr. Gallo testified that despite the termination of the relationship between RIF and Plaintiffs' being discussed informally, prior to Plaintiffs' dispute with Defendant, there were never any RIF Board minutes where the issue was addressed. **Plaintiffs' Ex. 11: Ron Gallo Depo at 313-14.** Additionally, Edward Valenti, a Board member of the supporting organizations, disputes that there was a movement to terminate the relationship between RIF and

Alan Shawn Feinstein, before Mr. Brown forwarded the April 22, 2002 letter. **Plaintiffs' Ex. 4: Edward Valenti Aff.**

For the foregoing reasons, Plaintiffs' contend there exist genuine issues of material fact as to whether Defendant intentionally interfered with the relationship between RIF and the plaintiffs, and whether that interference caused the termination of the relationship between RIF and the plaintiffs.

V. CONCLUSION

Genuine issues of material fact exist as to whether the Defendant failed to fulfill material terms of the March 17, 2000 contract, and as to the extent that Defendant justifiably relied on the terms of the Contract to his detriment. Genuine issues of material fact exist as to whether the April 22, 2002 publication was made with knowledge of its falsity or reckless disregard of the same, and whether it is actionable as libel even though plaintiff ASF is a public figure. Genuine issues of material fact exist as to whether Defendant intentionally interfered with the relationship between RIF and the plaintiffs', and whether that interference caused the termination of the relationship between RIF and the plaintiffs.

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied as to each count.

Plaintiffs
ALAN SHAWN FEINSTEIN
ALAN SHAWN FEINSTEIN
FOUNDATION and THE FEINSTEIN
FOUNDATION, INC.
By their attorneys,
Law Office of Mark B. Morse

____________________

MARK B. MORSE
RI Bar Reg No 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555
fax (401) 273-0937

**CERTIFICATION**

To: John Henn, Esq. Fed ex
Foley & Hoag, LLP
155 Seaport Boulevard
Boston, MA 02108

Brooks Magratten, Esq. hand Deliver
Vetter & White
20 Washington Place
Providence, RI 02903

I hereby certify that I mailed a true copy of the within to the above named.

DATE: 8/1/05

[signature]