UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALAN SHAWN FEINSTEIN,<br>THE ALAN SHAWN FEINSTEIN FOUNDATION,<br>THE FEINSTEIN FOUNDATION, INC.,<br>Plaintiffs,<br>v.<br><br>J. LARRY BROWN<br>Defendant. | CIVIL ACTION No. 03-0436/S |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Attorneys for Defendant

Brooks Magratten
(RI License # 3585)
VETTER & WHITE
20 Washington Place
Providence, Rhode Island 02903
401-421-3060

John H. Henn
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

## I. REPLY TO PLAINTIFF'S STATEMENT OF CONTESTED AND DISPUTED FACTS

Feinstein's alleged disputes with Defendant's Statement (set forth in "Plaintiffs' Statement of Contested Facts...and Disputed Facts ..." ("PSCF") either do not pertain to any genuine issue of a material fact, or are not supported by Rule 56(e)-qualified evidence. On the issue of Brown's motive in sending the April 22, 2002 letter, Feinstein argues (PSCF, ¶15 & p. 9, add'l ¶12) for a spite motive based on *Feinstein's own* August 29, 1999 letter to Brown. That letter does not meet the Rule 56(e) requirement of evidentiary admissibility to prove Brown's actual motive in 1999 or thirty-two months later. On the issue of whether Brown heard from others the information he put in his letter (PSCF, ¶27), none of the letters Feinstein cites speaks to what Brown himself heard. Indeed, as to the Conant-Arp letter, she carefully testified that it referred only to Feinstein fulfilling "written" commitments so as to avoid comment on a verbal commitment which she told Brown that Feinstein did not meet. (SMF, App.Ex. 10: Conant-Arp Dep. Transcript, 41-43).[1] Whether what Brown heard from others is actually true, or was in fact incorrect, incomplete or overstated, is not material to the issue of whether Brown acted with actual malice (*compare* PSCF, ¶¶32-35). That Brown's counsel's letter of August 12, 2003 preceded the RIF decision of September 28, 2003 to disaffiliate with Feinstein (PSCF, ¶43) constitutes no evidence of any causal connection between the two, much less creates a material issue as to the truth of Gallo's testimony concerning the reasons for that disaffiliation. The Brown testimony that Feinstein cites (PCSF, ¶56) certainly does not raise any genuine issue that Brown accomplished as much as he said he did (SMF, ¶56) under the March 17, 2000 contract, even without the Feinstein money.

As to Feinstein's additional 14 paragraphs of allegedly contested facts (PCSF, pp.7-10), none raises a genuine issue as to any fact material to Brown's motion. That Brown was able to

[1] Citations to "SMF" refer to Defendant's Statement of Material facts and accompanying exhibits. "Def. Mem." refers to Defendant's Memorandum in support of his Motion for Summary Judgment, and "Plf Mem" refers to Plaintiff's Memorandum in Opposition to that Motion.

accomplish some contract items even absent any funding from Feinstein (SMF, ¶¶55-56 & App. Ex. 3 [Brown Aff.] ¶8) is not refuted by Feinstein's additional facts (PCSF, pp. 7-8, ¶¶2, 5-7). It is irrelevant to the issue of actual malice whether the alleged libelous statements were "half truths [or] distorted" (Id., ¶8), because Feinstein has not offered Rule 56(e)-qualified evidence that Brown did not hear what he says heard from third parties, or that the third parties were either obviously unreliable or the information too outlandish to believe. That the Institute of International Sport's internal consideration of legal action against Feinstein (SMF, ¶32) was apparently never conveyed to Feinstein (PCSF, p. 9, ¶9) is hardly remarkable and creates no genuine issue that Brown's contrary impression shows actual malice. Feinstein's purported "evidence" as to Brown's awareness concerning Brown University (id., ¶10) is not supported by the Babbitt Affidavit, which does not mention Mr. Brown at all. Whether Feinstein can now rebut (id., ¶11) the Vermont Food Bank's sharp criticism that was communicated to Brown (SMF, ¶¶28, 36 & App.Ex. 4) creates no genuine issue as to whether Brown wrote his letter with actual malice. Feinstein's statement that RIF terminated its relationship with Feinstein and his entities due to the April 22, 2002 letter is supported by absolutely nothing in the Gallo testimony cited (PSCF, pp. 9-10, ¶13), and the Valenti Affidavit demonstrates on its face that Valenti is not competent to speak to RIF's internal discussions/decisions. (Id.)

## II. REPLY TO PLAINTIFF'S MEMORANDUM

### A. Defamation

Feinstein's argument that truth is a genuine issue (Plf Mem., 13-16) is irrelevant. Contrary to Feinstein's assertion (id., 16), Brown does not on summary judgment make "allegations that the statements published are true." Brown claims only that there is no genuine issue as to privilege, actual malice, and defamatory meaning. (Def. Mem., 12).

As to actual malice, Feinstein's evidence has not created a genuine issue that Brown "knew the statements were false" (Plf Mem., 17) *on April 22, 2002.* The communications from the five Feinstein charitable grantees listed in Brown's letter (id., 17-18) are all dated *after* April 22, 2002, and none of them denies having complained in the past to Brown or others about Feinstein fulfilling his commitments. *Compare* Norris v. Bangor Publishing Co., 53 F. Supp. 2d 495 (D. Me. 1999) (genuine issue as to actual malice where documents stemming from *defendant's own research, prior to publication* contradicted his defamatory statement). The fact that *after* April 22, 2002, Feinstein successfully solicited supportive letters from five entities does nothing to create a genuine issue that Brown had not previously heard, directly or indirectly, of complaints from them about Feinstein. (*See* SMF, ¶¶26-35, 39-40). In his affidavit (Brown Aff.), Brown recounts the various people he spoke with, and Feinstein has offered no Rule 56(e) qualified evidence to create a genuine issue that he did not speak to them as he describes.

For example, at Feinstein's request, the Institute of International Sport ("IIS") wrote him a reassuring letter after April 22, 2002 to the effect that he fulfilled his commitments. However, that letter does not say IIS had never previously complained to the contrary, and in fact IIS had done so (even including giving consideration to suing on the commitment). (SMF, ¶¶29-32). Feinstein has also raised no genuine issue to dispute that IIS complained to Gallo, who reiterated it to Brown. (id., ¶28); or that IIS complained to Brown directly. (Brown Aff., ¶17c). Consider URI as another example. URI's post-April 22, 2002 letter notwithstanding, Feinstein has offered no Rule 56(e) qualifying evidence to dispute Feinstein's own admission of severe underpayment of his 1998 obligations (SMF, ¶35), or Brown's statement that Bernie Beaudreau told Brown in February 2002 of Feinstein withholding timely payment to URI (Brown, Aff., ¶17b).

Feinstein's response to the Gregorian (Brown University) and Flateman (Vermont Food Bank) affidavits (Plf Mem., 18-19) are directed toward the issue of "truth" -- did Feinstein in truth

have a history of reneging on commitments, and/or did he have excuses for non-performance. This has nothing to do with creating a genuine issue as to actual malice. Indeed, the Gregorian affidavit simply reinforces the limited point made in Brown's affidavit (Brown Aff., ¶17 & 17a ), namely that Feinstein had told Brown of a "prior disagreement" with the university over funding, and Troy Earhart told Brown about "funding-related problems" with that institution. Feinstein has not contradicted Gregorian's affidavit that Feinstein unsuccessfully tried to stop Brown University from spending money Feinstein previously gave to it. (SMF, ¶38 & App.Ex. 5). Similarly, Feinstein offers no evidence to dispute Gallo's own testimony that he told Brown of Feinstein problems with the Vermont Food Bank (SMF, ¶28), much less Flateman's own statement that she told Brown that Feinstein had "reneged" on a funding commitment (id., ¶36 & App.Ex. 4). Feinstein's claimed excuse for not paying the Vermont Food Bank has nothing to do with what Brown was told prior to April 22, 2002. Feinstein has not offered a single piece of evidence to show that Brown was not told what he said he was told by the various third parties he identified (App. Ex. 3, ¶17), that Brown should have known that his sources were unreliable, or that Brown had serious doubts about those sources. (*See* Def. Mem., 16 and cases cited). A "more thorough investigation" by Brown was not required. Hall v. Rogers, 490 A.2d 502, 505 (R.I. 1985).[2]

Feinstein's legal discussion of privilege (Plf Mem., 19-21) is incorrect. (*See* cases cited at Def. Mem. 13-15). Whether a privilege exists is exclusively a legal issue for the court. Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 555 (1968). Plaintiff acknowledges that the concept of privilege encompasses a broad range of publisher's interests, recipient's interests and common

---

[2] Citations by Feinstein for the reverse proposition, that Brown had an obligation to tell the "complete story," (Plf Mem., 16) all address the *truth* of the statements in those cases, not whether the defendants acted with actual malice.

interests, all of which would apply here. (Plf Mem. 19).[3] Plaintiff then incorrectly contends that the privilege is limited to the employment and "intra-organizational" contexts. First, Ponticelli contains no such limitation, but merely discusses the broad common law privilege rule and then applies it to the employment context. Ponticelli, 104 R.I. at 551-555. The "intra-organizational" limitation simply does not exist. *See generally*, Restatement (Second) of Torts, §§ 593-598A (1979)(mentioning no such limitation). Indeed, two of the cases cited by Plaintiff to support this limitation contradict it. *E.g.* Mills v. C.H.I.L.D., Inc., 837 A. 2d 714, 720-721 (R.I. 2003)(day care center staff privileged to make defamatory statements to parents); DiBiasio v. Brown & Sharpe Manufacturing Co., 525 A. 2d 489, 492 (R.I. 1987)(*separate* companies conditionally privileged to discuss employment matters). Finally, the April 22 Letter concerned legitimate concerns between the ASF Foundation and RIF (which was supposed to exercise legal control of the former), not some totally extraneous subject such as Feinstein's personal life.

Feinstein identifies five bulleted items in the record that supposedly create a genuine issue that Brown exceeded his privilege by acting with malice (Plf Mem., 20-21). Feinstein's own August 29, 1999 letter (1st bullet) does not constitute Rule 56(e)-qualified evidence as to Brown's state of mind in April 2002, and at any rate taken as a whole hardly suggests hostility from Brown. Brown's three emails to the Klein Foundation (2nd, 4th and 5th bullets) relate only to funding that Feinstein had not made to *that* Foundation as part of a relationship that Brown had enabled,[4] and the last of the emails was sent (June 18, 2001) when Feinstein was already $2 million delinquent in paying his pledge to Brown. Feinstein cannot create a genuine issue that Brown's April 22, 2002 letter was motivated by actual malice merely by showing that Brown was frustrated or

[3] Besides Brown's own legitimate interest and Gallo and Brown's common interest (see Def. Mem., 14), Gallo's knowledge of Feinstein's funding difficulties with other institutions (of which Gallo already had some knowledge) certainly would be of service to Gallo in knowing the size of the task he faced in trying to produce a resolution.

[4] The March 17, 2000 contract (SMF, App. Ex. 1 at ¶3) expressly refers to working with the Klein Foundation.

annoyed at not being paid himself, and at a third party not being paid where Brown had assisted in creating that promised funding as well. *Compare* DiBiasio v. Brown & Sharpe Mfg Co., 525 A. 2d 489, 492 (R.I. 1987)(genuine issue as to malice because defendant's changing explanations for defamatory statement were inconsistent and contradictory). Feinstein's remaining cite (3rd bullet) is entirely trivial. Brown's letter on its face, moreover, cannot be read as *primarily* motivated by anything other than seeking to obtain the promised funding. The "only reasonable conclusion" is that any ill will was entirely incidental and without legal significance. Ponticelli, 104 R.I. at 556.

As to defamatory meaning, Feinstein's final argument (Plf Mem., 22) ignores Swerdlik, which states that the "decisive inquiry 'is what the person *to whom the communication was published reasonably understood* as the meaning intended to be expressed.'" Swerdlick v. Koch, 721 A. 2d 849, 860 (R.I. 1998) (citations omitted). The issue of "proof of special harm" goes to proof of damages, not defamatory meaning. *See* Restatement (Second) of Torts, § 573 (1977).

**B. Tortious Interference**

Feinstein raises no genuine issue as to the two grounds on which Brown seeks dismissal: that on April 22, 2002 he did not intentionally interfere with the RIF-ASF relationship, and that his letter was not in fact the reason RIF severed that relationship. Brown obviously knew of the relationship (that's the reason he wrote the letter), and the fact that Feinstein told him to communicate through Gallo, and Gallo and Brown agreed that a letter might help, simply confirms the lack of any genuine issue that Brown by communicating to Gallo was in fact proceeding with *no* intent to interfere with any relationship(s) -- much less proceeding with any improper intent. (*Compare* Plf Mem. 23-24, and cases cited).

Feinstein misstates Rhode Island law while suggesting that Brown had to have a financial interest *in RIF itself* to avoid tortious interference." Id., 24. Such an interest would be one way of establishing that the conduct at issue was not "without justification." (*See* Def. Mem. 19, citing

Rhode Island law on the elements of tortious interference, including justification). Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co., 447 A. 2d 377, 380 (R.I. 2000), which concerns interference with prospective relations, imposes no such limitation on justification for conduct. *See* UST Corp. v. General Road Trucking Corp., 783 A. 2d 931, 937 n. 5 (R.I. 2001)(listing seven factors appropriate to analysis of whether the allegedly tortious action was justified). Moreover, the insurance company defendant in Federal Auto Body did not *own* any financial interest in the third party policy holders, but merely had a contractual relation with them which it properly sought to protect. Brown, similarly, has a contractual relationship with ASF Foundation, which he was protecting by communicating with RIF, the organization that controlled and supervised ASF Foundation funds.

Feinstein's additional arguments (Plf Mem., 23-26) do nothing to show a genuine issue of material fact. That other institutions had to make efforts to obtain promised funding is certainly relevant to Brown's letter making such an effort, and Federal Auto Body (which does not contain the word "necessary") does not require that Brown's mentioning of those other institutions be necessary to accomplish Brown's ends. (*Compare* Plf Mem. 25). "Striking the right balance" between Brown's desire that Feinstein comply with the contract and Brown's own alleged "inability to comply" (*id.*, 26) has nothing to do with the law of justification.

Finally, Feinstein offers no evidence to refute Gallo's express testimony that Brown's April 22, 2002 letter had nothing to do with RIF's decision seventeen months later (on September 28, 2003) to terminate the relationship. The multi-year "dispute" between Brown and Feinstein is not the same thing as the single paragraph in the specific April 22, 2002 "letter" which Feinstein claims was the tortious interference. That multi-year dispute certainly played a role in RIF's decision, most importantly (per Gallo) because Feinstein told RIF in late 2003 that he had filed

this lawsuit without RIF prior knowledge.[5] Feinstein provides no evidence from which a factfinder could reasonably conclude that the "April 22, 2002 letter was the precipitating cause" (Plf Mem., 28) of the termination .

Further, Brown does not contend that the relationship was "on the verge" of dissolution (id.), but merely offers Gallo's statement that RIF "over the years felt that the way Alan practices philanthropy was not in keeping with how we like to do business." SMF, ¶45. The affidavit of Valenti (a Feinstein employee) does not purport to claim any knowledge of RIF's internal thinking about the Feinstein relationship over the years, and, until RIF made the decision to terminate the relationship, it would obviously have made no sense for RIF to advise Feinstein of that thinking.

**C. Breach Of Contract**

Feinstein first argument (Plf Mem., 7-9) confuses asking celebrities to dig into their own pockets to match money given by Feinstein with using the names and activities of celebrities to publicize the Hunger Free America project. Feinstein's own affidavit (Plf App. Ex. 1, ¶4) says only that Brown told him "about his connections to the Hollywood community … and how he could use those connections to publicize the Hunger Challenges for which I had become known." Neither that affidavit, nor those of Walton and Zammarelli (id., Exs. 2-3) suggest that these celebrities were going to use their own money, as opposed to their names.

Secondly, it is for this Court to construe the contract. Any ambiguity in the term "celebrity challenge" is immaterial, because *the term is absent from the contract.* The words "to utilize celebrity interest and involvement to achieve media coverage and public interest in ending hunger in America" (Plf Mem., 8) are broad. With no funding from Feinstein, Brown still accomplished such involvement, *e.g*, publishing a "Celebrity Cookbook" involving nearly 60 Hollywood

---

[5] Feinstein's August 28, 2003 letter to RIF (SMF, App. Ex. 28) expressly states that "I have today brought suit against [Brown] …." That the suit did not get filed by counsel until September 2 is irrelevant to what RIF was told.

celebrities (*see* Exhibit 34 attached),[6] getting President Clinton to film a public service message for the Hunger Free America Campaign (*see* Exhibit 35, at 110-111, attached), and involving the actor Jeff Bridges in several projects called for by the contract (*see* Exhibit 36 attached).

Further, the requirement to market Feinstein's grants as challenge grants to the End Hunger Network ("EHN") does not limit celebrities to giving their own money. The EHN uses celebrities to promote its efforts (Brown Aff. ¶ 6)[7] and Brown worked with EHN to raise $3 million in year one, a third of which directly or indirectly benefited Brown's Center. SMF, ¶¶ 56.

As to naming, Feinstein simply ignores Brown's evidence (much less raises a genuine issue) that post-contract signing, Feinstein added a requirement that his gifts go to *an endowment*. (SMF, ¶¶51-52). The contract imposes no such requirement. To be sure, Brandeis did for a time seek to secure an additional promised bequest (not grant) from Feinstein of $2 million *for an endowment*, but Brown ultimately secured from the Brandeis president an agreement to allow naming (but not endowment) for $3 million, which Feinstein has testified would not help given the other and unrelated claims Feinstein had that the contract was in "breakdown". (SMF, ¶50).

As to the new issues of non-compliance that Feinstein has now raised (Plf Mem. 11), they are not in his Complaint; and Feinstein cannot claim that all the elements of the contract were not performed when (i) they obviously could not be absent any of the promised funding (not even the first payment due in 2000); and (ii) Brown's performance was to occur over three years.

Feinstein's further comments (id., 12) about Brown are not supported by the testimony cited. Moreover, in that testimony, Brown goes on to say that he expressly spoke with Jeff

---

[6] Excerpts from the Celebrity Cook Book were inadvertently omitted from the Affidavit of J. Larry Brown.

[7] The nature of the EHN is not a mystery. The EHN is "a nonprofit organization working with the entertainment community to encourage, stimulate and support media projects, programs and events aimed at involving people in ending childhood hunger." EHN Homepage, Mission Statement, *available at* http://www.endhunger.com/ (accessed August 13, 2005). There is no mention in EHN's mission of individual celebrity donations. Id.

Bridges about "challenging individual celebrities" in the first year to give money themselves, and Bridges advised that this was not appropriate until a program was in place. (Plf App. Ex. 16, at 227-228). Feinstein's commitment was "independent and not contingent on the success of the annual efforts to match Feinstein support" (SMF, App. Ex. 1, ¶6), and Feinstein thwarted any effort to challenge anyone after the first year because he provided no money for anyone to match.

Feinstein's point about his "Hunger Brigade" and the Klein Foundation is, as Feinstein notes, "the subject of a separate contract" (Plf Mem., 11). This has nothing to do with creating a genuine issue as to whether a Brown breach of the contract excused Feinstein's breach.

As to the legal requirements for enforcing the contract, the charitable promise in this case is in writing, unlike that in the case cited by Feinstein. Filippi v. Filippi, 818 A. 2d 608, 612 (R.I. 2003) (involving promissory estoppel on an oral promise). Plaintiff offers no legal authority for the claim that the contract must be construed with reference to Feinstein's subjective "donative intent" (Plf Mem. 10). Finally, Plaintiff's arguments regarding detrimental reliance (id., 11) are besides the point. The present motion involves only Feinstein's claim that Brown breached the contract, as to which detrimental reliance (which certainly existed) is irrelevant.

Dated: August 18, 2005

Brooks Magratten
(RI License # 3585)
VETTER & WHITE
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060

John H. Henn
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1130

CERTIFICATE OF SERVICE

To: Mark B. Morse, Esq.
111 Wayland Avenue
Providence, RI 02906

I hereby certify that I served on the above-named counsel of record a copy of the within document by first class mail, postage prepaid, on the 12th day of August, 2005.

[signature]