UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ALAN SHAWN FEINSTEIN, THE FEINSTEIN FOUNDATION, and THE ALAN SHAWN FEINSTEIN FOUNDATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 03-436 S |
| J. LARRY BROWN, | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND DECISION

WILLIAM E. SMITH, United States District Judge

When a mutually beneficial relationship between a philanthropist and an academic devolved into a skirmish replete with name-calling and unfulfilled commitments, the parties rushed to the nearest courthouse. This Court eventually was determined to be the correct forum.[1] Defendant J. Larry Brown ("Brown") has moved for summary judgment on the three claims asserted against him: defamation, tortious interference,[2] and breach of contract.

---

[1] Plaintiffs sued in Rhode Island Superior Court, and Brown removed the case to this Court; Brown sued in Massachusetts. This Court's opinion, Feinstein v. Brown, 304 F. Supp. 2d 279 (D.R.I. 2004), provides the details.

[2] The Complaint calls this claim "Interference with Advantageous Business Relations," while Brown refers to the count as one for "tortious interference," and Plaintiffs' Memorandum calls it "tortious interference with business relations." Here, the terms are used interchangeably.

## I.   Background[3]

All involved in this litigation share the goal of ending hunger.   Plaintiff Alan Shawn Feinstein ("Feinstein") is a prominent Rhode Island philanthropist.   Feinstein's full-time philanthropy, which he conducts in a very high-profile manner, makes him a public figure.   Feinstein serves as the executive director of The Feinstein Foundation ("TFF") and as a member of the board of directors of The Alan Shawn Feinstein Foundation ("ASFF"), the two organizational plaintiffs.   Both TFF and ASFF are non-profit corporations, incorporated in Rhode Island, with their principal place of business in Cranston, Rhode Island.

In 1998, ASFF became a "supporting organization" of The Rhode Island Foundation ("RIF").[4]   RIF is a Rhode Island charity whose mission is "connecting private philanthropy to the public good." The Mission of the Rhode Island Foundation, http://www.rifoundation.org/matriarch/OnePiecePage.asp?PageID=14& PageName=GiveMission (last visited Apr. 20, 2006).   One of these "principles" is the use of "Partnerships," described by RIF as "[a] willingness to make connections and work with others — donors, community organizations, government, other local funders, national

---

[3] Unless otherwise noted, the background facts are undisputed.

[4] As a "supporting organization," ASFF maintained a separate Board of Directors and had more discretion regarding the distribution of funds, including the option to spend principal. Pls.' Mem. at 1-2.

foundations, etc. — to augment and make more effective our own resources." Id. RIF and ASFF share a connection in Dr. Ronald Gallo ("Gallo"), President and CEO of RIF, and an officer of ASFF at all times relevant to this lawsuit.

Brown's contribution to solving the hunger problem focuses on applied research and policy analysis. He is a Massachusetts resident and currently directs the Center on Hunger and Poverty ("Center") at the Heller School for Social Policy and Management at Brandeis University.[5] The Center's "activities include research and policy analysis, public education initiatives, and assistance to policy makers and organizations across the country on poverty- and hunger-related issues." Program Directors & Managers, http://www.centeronhunger.org/staff.html (last visited Apr. 20, 2006).

During the months prior to March 2000, Brown approached Feinstein in hopes of convincing Feinstein to provide financial support for the Center. The entree was successful. Brown prepared an agreement and presented it to Feinstein. On March 17, 2000, Feinstein and Brown executed a document entitled "Agreement Between Alan Shawn Feinstein Foundation and J. Larry Brown" (the "Contract").[6] The Contract's stated purpose was "to support the

---

[5] The Center was originally established at Tufts University, where Brown was affiliated until July of 2000.

[6] Feinstein signed the Contact "Personally and in behalf of the Alan Shawn Feinstein Foundation." Contract ¶ 3. At this time,

Center's multi-year national initiatives designed to end hunger in America."   Contract ¶ 1.   The Contract set forth a variety of obligations for Brown, Feinstein, and ASFF.   For example, ASFF was to "provide three grants of $1 million annually . . . [that] will be marketed publicly by the Center as 'challenge grants' to the End Hunger Network . . . ."[7]   Id. at ¶ 6.   The Contract provided Feinstein with naming rights to the Center.   Id. at ¶ 10.   As is his wont, Feinstein contemplated for the Center a Feinstein moniker "to be determined by [Feinstein]."   Id.

Brown's obligations were numerous, including directing a national campaign, creating and supporting a fifty state coalition, putting on high-profile events, and designing and marketing a hunger education curricula for elementary and middle schools.   Id. at ¶¶ 3, 4.   An "Action Plan" for the national campaign was attached to the Contract, setting forth tasks for each of the three years of the campaign.

Although the Contract specified that the first one million dollar payment was due on June 1, 2000, Feinstein did not pay it. Feinstein claims that Brown requested a delay in the first payment

Brown was affiliated with Tufts.

[7] The End Hunger Network is located in California, and, according to Brown, "sometimes uses celebrity name recognition to call attention to anti-hunger efforts."   Def.'s Mem. at 23. According to Feinstein, the End Hunger Network "counts among its membership a number of movie stars and persons well known in the film industry."   Pls.' Mem. at 2.

because of Brown's move from Tufts to Brandeis.  As time passed, however, Feinstein became dissatisfied with Brown's efforts.  For example, Feinstein believed that Brown could not secure adequate celebrity involvement in the national campaign, nor could he honor Feinstein's reserved right to name the Center.  As a result, Feinstein refused to pay any of the one million dollar installments contemplated by the Contract.[8]

According to Brown, Feinstein advised Brown that in Feinstein's view, Brown had failed to fulfill the Contract's terms; therefore, "the Contract was null and void."  Def.'s Statement of Material Facts as to which there is No Genuine Dispute ¶ 6.  Around this time, RIF's Gallo learned of the conflict over the Contract, and took an interest in resolving the dispute.

On April 18, 2002, Gallo and Brown met at the Hope Club in Providence, Rhode Island, where they discussed the idea of a letter regarding the lack of payment under the Contract.[9]  Gallo thought a letter "might be useful in bringing the parties together."  Gallo Dep. 307, March 7, 2005.  Brown faxed a draft of the letter to Gallo; Gallo reviewed it and did not suggest any changes.  Id.  On April 22, 2002, Brown sent the letter ("April 22 Letter" or

---

[8] At least $2,993,000 was never paid.  Feinstein claims that up to $7,000 was paid to Brown through an intermediary or agent.

[9] Gallo said that "[Brown] had wanted to write this letter . . .," Gallo Dep. 307, Mar. 7, 2005, while Brown said that "Mr. Gallo had suggested that I draft this letter."  Brown Dep. 354, July 13, 2004.

"Letter") to Gallo via overnight mail.  Brown Aff. ¶ 21, June 9, 2005.

Brown's purported purpose in sending the correspondence was described in the Letter itself:  it was Brown's "sincere hope that by bringing this matter to the attention of [RIF], it [would be] resolved amicably, quickly and fully."  Letter at 3.  The Letter also referenced the "common interest" that Gallo, Brown, and possibly Feinstein himself, shared in resolving the dispute.  Id.

Feinstein's defamation claim arises from the fifth paragraph of the Letter.  This paragraph opened by stating that "We have learned, for example, that Alan Shawn Feinstein apparently has a history of making funding commitments and then reneging on them."  Five Rhode Island institutions that allegedly encountered problems with Feinstein are listed.

Finally, Feinstein and TFF maintain that their relationship with RIF was in good standing prior to Brown's transmission of the April 22 Letter to RIF.[10]  Minutes from an August 28, 2003 meeting of RIF's Board of Directors indicated that once the Contract dispute with Brown settled, RIF and Feinstein "should dissolve their relationship in as amicable a manner as possible."  Def.'s Ex. 29.

_____

[10] As evidence of this, Feinstein and TFF maintain that there were no outstanding issues with donees and that RIF was contemplating additional associations with Feinstein and TFF.

II. <u>Standard of Review</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The role of summary judgment is to look behind the facade erected by the pleadings and assay the parties' proof in order to determine whether a trial will serve any useful purpose." <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003). This Court must view all of the facts in the light most favorable to the non-moving parties, and draw from those facts all of the reasonable inferences that favor the non-moving parties. <u>See</u> <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306 (1st Cir. 1997).

Here, where Brown seeks summary judgment against parties bearing the burden of proving the claims asserted against him, Brown bears the "initial responsibility of informing the district court of the basis for [his] motion, and identifying those portions of [the record] which [he] believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). If Brown prevails on this front, then the burden shifts to plaintiffs "to demonstrate that a trialworthy issue exists." <u>Mulvihill</u>, 335 F.3d at 19. However, plaintiffs cannot meet their burden by merely alleging that a fact

7

is in dispute or by simply denying the absence of disputed facts. See <u>DeNovellis</u>, 124 F.3d at 306.  Rather, plaintiffs must show that there is sufficient evidence for a jury to find for them on each essential element of their claims.  <u>Id.</u>  In other words, plaintiffs must provide evidence that is both "genuine" — " such that a reasonable factfinder could resolve the point in favor of the nonmoving party" — and "material" — "the fact is one that might affect the outcome of the suit under applicable law."  <u>Mulvihill</u>, 335 F.3d at 19.  Where plaintiffs present no such evidence, or present evidence that is "merely colorable or is not significantly probative," summary judgment may be appropriate.  <u>DeNovellis</u>, 124 F.3d at 306.  Importantly, in an action such as this one, summary judgment is not necessarily precluded where the plaintiffs' claims involve "elusive concepts such as motive or intent" if plaintiffs oppose the motion with only "conclusory allegations, improbable inferences, and unsupported speculation."  <u>Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 13 (1st Cir. 1994) (internal citations and quotation marks omitted).

III. <u>Analysis</u>

    A.    <u>Defamation</u>[11]

In Rhode Island, a defamation claim against a public figure can succeed only where: (1) there is an utterance of a false and defamatory statement concerning another; (2) that utterance is an unprivileged publication to a third party; (3) such publication is made with actual malice, i.e., with knowledge of the statement's falsity or with reckless disregard for the statement's falsity; and (4) damages are suffered. <u>Cullen v. Auclair</u>, 809 A.2d 1107, 1110 (R.I. 2002) (citing, inter alia, <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-80 (1964)). Brown is entitled to summary judgment on the defamation claim if he can demonstrate Feinstein's inability to prevail, as a matter of law, on any one of these four elements, where no material facts remain in dispute.

Feinstein claims that Brown defamed him by publishing the fifth paragraph of the April 22 Letter. In seeking summary judgment on this claim, Brown argues that the April 22 Letter (1) was not published with actual malice; (2) was privileged; and (3) was not defamatory because it did not cause Gallo to alter his view of Feinstein.

The Letter's relevant paragraph states:

We have learned, for example, that Alan Shawn Feinstein apparently has a history of making funding commitments and then reneging on them. In speaking to relevant

---

[11] Feinstein is the sole plaintiff in the defamation claim.

9

parties involved, we are aware that the circumstances sometimes vary (payment refused altogether, subsequent payments held up or cancelled and new conditions or demands placed on the recipient organization that were not contained in the original agreement). But all instances, together, demonstrate an apparent pattern of reneging on written agreements. We believe that this pattern pertains to organizations both outside and within Rhode Island, and that it includes at least the following in your state: University of Rhode Island, Johnson and Wales, Providence College, Institute for International Sport, and the Lewis Feinstein Alzheimers [sic] Center. Additionally, we are informed that on more than one occasion the consideration of legal action was the only thing that apparently induced Alan to finally fulfill the legal commitments that he had made.

Letter at 2. Brown published the Letter to Gallo and also to persons involved with the Center and its finances. Brown Aff. ¶ 24, June 9, 2005. Gallo subsequently circulated the Letter within RIF and to board members. Gallo Dep. 252, Jan. 31, 2005.

### 1. Actual Malice

Brown argues that Feinstein cannot demonstrate the requisite level of fault, known as "actual malice," necessary to prevail in a defamation claim against a public figure. The burden of proving actual malice rests with Feinstein. Hall v. Rogers, 490 A.2d 502, 505 (R.I. 1985). This burden requires Feinstein to prove, by clear and convincing evidence, see Cullen, 809 A.2d at 1110, that Brown published the Letter "with knowledge that it was false or with reckless disregard as to whether it was false or not." Hall, 490 A.2d at 505. It is not enough to show the information in the Letter was incorrect, because Brown was under no duty to verify the information. If the sources appeared reliable, and Brown had no

10

doubts about the accuracy of the information conveyed, then his conduct does not rise to the level of actual malice.  See id.

In support of his Motion, Brown provides evidence of the following:  (1) Troy Earhart, a former Feinstein advisor, told Brown about funding-related problems between Feinstein and all five of the organizations named in the Letter; (2) Feinstein himself told Brown of a funding disagreement with Brown University; (3) Brown spoke with Dan Barry and Dan Doyle at the Institute for International Sport ("Institute") regarding delayed payments from Feinstein; (4) Brown spoke with Cynthia Conant-Arp at the Louis Feinstein Alzheimer's Center ("Alzheimer's Center"), regarding a withdrawn verbal funding commitment; (4) Brown heard of delayed payments to the University of Rhode Island ("URI") from Bernie Beaudreau of the Rhode Island Community Food Bank; and (5) Gallo told Brown of issues regarding Feinstein's funding of other organizations, including the Institute, the Vermont Food Bank, and the International Institute of Rhode Island.  Brown Aff. ¶¶ 17, 19. Brown contends that these sources appeared reliable, as they included Feinstein himself and individuals who had relationships with Feinstein entities.  Brown does not claim that the statements he published were necessarily true; rather, he claims that there is no genuine issue as to whether he heard about Feinstein's alleged history of reneging.

In response to Brown's proffer, Feinstein denies that Brown heard of a history of reneging because Feinstein claims he does not have "a history of making funding commitments and reneging on them." Pls.' Mem. at 13. For support, Feinstein first points to his own affidavit, which merely asserts Feinstein's personal belief that Brown was never told about the alleged history of reneging. This statement of Feinstein's own belief, however, merely alleges the existence of a factual dispute; it is not evidence that may be used to demonstrate the existence of a material factual dispute. See DeNovellis, 124 F.3d at 306.

Next, Feinstein maintains that a collection of affidavits, depositions, and letters, from individuals representing organizations listed in the Letter, refute the claim that Feinstein reneged on funding commitments to these organizations. This evidence reveals that while there may have been disputes regarding payments, including late payments, no one representing these organizations suggested that Feinstein "reneged" on his pledges.

This assemblage also demonstrates that no outstanding funding issues remain with any of the organizations named in the Letter. Thus, Feinstein argues that because he ultimately fulfilled all of his commitments, he has not reneged on any of them.[12]

---

[12] For example, Paul Witham, currently URI's Associate Vice President for Development, recalled in his deposition that all of Feinstein's pledges had been fulfilled. Witham Dep. 47-49, Apr. 18, 2005. An unsworn June 17, 2002 letter from Thomas L. Wright, Senior Vice President of Development at Johnson and Wales, thanked

12

Feinstein's final argument zeroes in on the lack of evidence supporting the last sentence in the allegedly defamatory paragraph. This sentence stated "we are informed that on more than one occasion the consideration of legal action was the only thing that apparently induced [Feinstein] to finally fulfill the legal commitments that he had made." The only evidence relating to Brown hearing of legal action against Feinstein is Dan Barry's deposition testimony that the Institute internally discussed resorting to legal action. Barry Dep. 67. However, if the discussions were only internal, as stated by Barry, then Feinstein presumably would not have known about them and they could not have "induced" Feinstein to pay.[13]

---

Feinstein for his generous support and stated that Feinstein met his funding commitments. Pls.' Ex. 21. An unsworn letter from Dan E. Doyle, Jr., founder and executive director of the Institute, noted that Feinstein "fully lived up to his financial commitment to the Institute." Pls.' Ex. 20. Regarding the Alzheimer's Center, Feinstein points to Conant-Arp's statement that Feinstein upheld his written contractual agreements. Conant-Arp Dep. 42, May 31, 2005. Finally, an affidavit from Joseph Brum, Special Assistant to the President for Development Projects at Providence College, stated that TFF paid only $4,750,000 of a five million dollar pledge. Brum Aff. ¶ 5, May 12, 2005. Brum explained that he had directed the inclusion of the following statement when he wrote off the outstanding two hundred and fifty thousand dollars: "[t]he focus of the program initially intended by the donor and the College has changed." Id. Although this affidavit supports Brown's contention that he heard of funding disputes at Providence College, it does not provide any basis for the allegation that Feinstein refused to pay or cancelled payments because Providence College resolved the matter.

[13] In addition, Gallo stated that prior to April 22, 2002 (the date of the Letter), he was unaware of any instances where the

13

Finally, Brown suggests that his use of the term "reneging" was meant to refer broadly "payment refused altogether, subsequent payments held up or cancelled, and new conditions or demands placed on the recipient organization that were not contained in the original agreement." Letter at 2. However, Black's Law Dictionary defines the verb "renege" as "to fail to keep a promise or commitment; to back out of a deal." Black's Law Dictionary 1041 (7th ed. 2000). So while there is ample evidence that Brown heard of late payments and other funding issues with the named organizations, no evidence demonstrates that anyone from a named organization characterized Feinstein's behavior as "reneging," as that term is properly defined, and no evidence shows that Brown heard of refused payments or cancelled payments. Moreover, there appears to be no basis for Brown's claim in the Letter that he heard "that on more than one occasion the consideration of legal action was the only thing that apparently induced [Feinstein] to finally fulfill the legal commitments that he had made."

Given the state of the evidence at present, there is enough evidence to create a jury question on the issue of actual malice. But that does not end the matter.

---

threat of legal action was necessary to prompt Feinstein to pay on a commitment. Gallo Dep. 306, Mar. 7, 2005.

## 2.  Privilege

Although his actual malice argument fails, Brown presents additional grounds for summary judgment on the defamation claim. Brown maintains that the April 22 Letter was a privileged publication and therefore Feinstein cannot prove the second element of the defamation claim.  The burden of proving that the allegedly defamatory publication is not privileged lies with Feinstein.  See Mills v. C.H.I.L.D., Inc., 837 A.2d 714, 720 (R.I. 2003).  The determination of whether the privilege exists is a question of law for a court to decide.  Id.  "A qualified privilege exists if the publisher makes the statement in good faith and 'reasonably believes that . . . to speak out is necessary to protect [] his own interests . . . .'"  Id. (quoting Ponticelli v. Mine Safety Appliance Co., 247 A.2d 303, 305-06 (R.I. 1968)).[14]

Here, the Letter stated that it was "a final good faith effort to reach an amicable resolution . . . ."  Letter at 2.  After noting that Feinstein's payments were extremely overdue, the Letter noted that "I reluctantly have reached the conclusion that I cannot afford to be patient any longer."  Id. at 1.  Thus, Brown apparently felt compelled to write the Letter as a means of trying

---

[14] Feinstein contends that privileged publications must be made either "intra-organizational" or "in an employment context."  Pls.' Mem. at 20.  While many cases fall into these two categories, privileged communications are not so limited; rather, privileged communications can occur in a variety of situations.  See generally Mills, 837 A.2d at 720 (noting that the court determines whether the privilege exists "on the facts of a particular case").

15

to obtain the money he claimed he was owed; in other words, to protect his financial interests (and presumably the financial interests of the Center as well). Because the Letter appears to be a good faith effort that Brown reasonably believed necessary to protect his own interests, and because there is no evidence proffered by Feinstein to contradict this plain meaning, Brown has established that he had a qualified privilege to send the Letter. See Mills, 837 A.2d at 720.

"A qualified privilege also may exist when the parties communicating share a common interest." Id. For a communication to be so privileged, "[a] 'reciprocity of duty' must exit between the publisher of the statement and the recipient, such that the latter has an interest in receiving the information that corresponds to that of the publisher in communicating it." Id. (citing Ponticelli, 247 A.2d at 306). See Mills, 837 A.2d at 720 (communication may be privileged where the information affects a sufficiently important interest and the recipient's knowledge of that information may assist in protecting that interest). Here, Gallo's interest in receiving the Letter was to assist in resolving the dispute. See Gallo Dep. 249-50, Jan. 31, 2005; Gallo Dep. 307, Mar. 7, 2005. Brown's interest in communicating with Gallo was the same: he too sought to resolve the dispute. See Letter at 3 ("It is my sincere hope that by bringing this matter to the attention of [RIF], it will be resolved amicably, quickly, and fully.").

16

Feinstein does not dispute that Gallo sought to help Brown and Feinstein resolve the conflict over the Contract, nor does he dispute that both Gallo and Brown understood that a resolution of the dispute was a common interest of both Gallo and Brown. The Letter, in fact, references this "common interest." Id. Thus, Brown and Gallo had a sufficient "reciprocity of duty" so as to create a qualified privilege.

Of course, a qualified privilege may be attacked. Id. To overcome the privilege, Feinstein must prove that Brown acted with "express malice." Mills, 837 A.2d at 720. This species of "malice" is distinct from (though not entirely unrelated to) the "actual malice" standard. Compare Id. with Cullen, 809 A.2d at 1110. Express malice exists where "the primary motivating force for the communication was the publisher's ill will or spite." Mills, 837 A.2d at 720 (quoting Ponticelli, 247 A.2d at 308). "Where, however, the causative factor [for the publication] was the common interest, a publisher's resentment toward the person defamed is immaterial and any incidental gratification is without legal significance." Swanson v. Speidel Corp., 293 A.2d 307, 311 (R.I. 1972) (quoting Ponticelli, 247 A.2d at 308).

Feinstein points to five examples of express malice. The first is Feinstein's own affidavit. As discussed above, however, the beliefs described in Feinstein's own affidavit do not prove any facts and are irrelevant for summary judgment purposes. The other

17

four are statements made by Brown to others, by facsimile or e-mail.

The first is a facsimile Brown sent to Beth Reisboard, director of the Klein Foundation, which stated that Brown's monthly meetings with Feinstein would continue "probably for the rest of my hopefully short life." Pls.' Ex. 33. The second is an e-mail Brown sent to Brandeis' Dean John Shonkoff, in which Brown referred to Feinstein as "a piece of work." Pls.' Ex. 34. The third example is another facsimile to Reisboard, in which Brown stated that he "cannot guarantee that [Feinstein] will fulfill his original promise for the funding he said he'd give" to the Klein Foundation. Pls.' Ex. 35. Finally, the fourth example is a facsimile to Reisboard, in which Brown wrote that Feinstein is "everything we always say he is, and I think you should shoot the person who hooked you up with him in the first place!" Pls.' Ex. 36.

Relying on Swanson, 293 A.2d 307, 311, Feinstein maintains that these four comments establish a disputed issue of fact as to the question of express malice. In Swanson, the Rhode Island Supreme Court found that the question of whether "the causative factor underlying the alleged communications was ill will or spite rather than common interest" was a question for the jury. Swanson, 293 A.2d at 311.

18

Feinstein's patchwork of unrelated statements pale in comparison to the statements in <u>Swanson</u>. In <u>Swanson</u>, the court was required to assume that the following information was <u>untrue</u>: "that the plaintiff was a 'chronic absentee', indifferent, irresponsible, needed constant supervision . . . and had poor attendance." <u>Id.</u> at 308. Further, the court was required to presume that these untrue comments were repeated, by the defendant (the plaintiff's former employer), to several prospective employers who were contacting the defendant as a reference for the plaintiff. <u>Id.</u> Here, the statements Feinstein cites are at best evidence of spirited comments that Brown made to two individuals. Although unflattering, the comments express Brown's opinions and frustrations regarding what he considered a difficult relationship. <u>See</u>, <u>e.g.</u>, Brown Dep. 417. The comments do not, even when viewed in the light most favorable to Feinstein, indicate that the "motivating force" for Brown's publication of the Letter to Gallo was Brown's "ill will or spite" towards Feinstein.

Therefore, the only reasonable conclusion is that Brown's motivation for publishing the Letter to Gallo was to remedy the Contract dispute. <u>See</u> <u>Swanson</u>, 293 A.2d at 311. Any resentment of Feinstein by Brown is "immaterial and any incidental gratification is without legal significance." <u>Id.</u> (quoting <u>Ponticelli</u>, 247 A.2d at 308). If there was any spite at all — and it is by no means clear that there was — it was "merely incidental rather than

19

motivating," and the conditional privilege survives incidental spite. <u>Swanson</u>, 293 A.2d at 311.

Accordingly, while Feinstein could possibly prevail on the actual malice element of his claim, Brown has demonstrated that Feinstein cannot show the communication was unprivileged. Brown, therefore, is entitled to summary judgment on this count.

B.   <u>Tortious Interference</u>

Feinstein and TFF's claim of tortious interference alleges that Brown interfered with the unique relationship that Feinstein and TFF had with RIF. Specifically, Feinstein and TFF claim that "[s]hortly after the [April 22 Letter] was published to RIF, the unique relationship . . . began to deteriorate." Pls.' Mem. at 5. Brown, however, contends that RIF had contemplated severing its ties with Feinstein as far back as the late 1990s and that Feinstein's decision to file suit against Brown, without first consulting RIF, triggered RIF's severance of its ties to Feinstein and his charities. Def.'s Mem. at 8, 21.

To establish tortious interference, Feinstein and TFF must prove: (1) the existence of a contractual relationship; (2) defendant's knowledge of that relationship; (3) defendant's intentional act of interference; and (4) consequent damages. <u>Belliveau Bldg. Corp. v. O'Coin</u>, 763 A.2d 622, 627 (R.I. 2000) (quoting <u>Smith Dev. Corp. v. Bilow Enters., Inc.</u>, 308 A.2d 477, 482 (R.I. 1973)). To satisfy the intentional interference element,

Feinstein and TFF must show that Brown acted with "legal malice," meaning that Brown had "an intent to do harm without justification." Mesolella v. City of Providence, 508 A.2d 661, 670 (R.I. 1986). In other words, to ultimately prevail, Feinstein and TFF must prove that Brown acted "without justification" or for an "improper" purpose. Belliveau, 763 A.2d at 628.

"Unlike other intentional torts, tortious interference with contract has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act * * *," i.e., of a justification to interfere. Id. (internal citation and quotation marks omitted). Determination of whether the interference was improper or justified "depends upon a judgment and choice of values in each situation," and necessitates weighing seven factors enumerated in the Restatement (Second) Torts § 767. Id. at 628 n.3 (quoting Restatement (Second) Torts § 767 at 28 (1979)). The factors are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (Second) Torts § 767 at 26-27 (1979).

While this Court finds factors (c) and (e) neutral because Feinstein, TFF, and Brown all work in the pursuit of good causes, the majority of the factors (factors (a), (b), (d), and (g))

21

indicate that Brown's interference was justified.  Brown's conduct included discussing the Contract dispute with Gallo and sending the April 22 Letter to Gallo.  Brown's motive was to obtain payment.[15] In addition, Brown sought to advance the interests of the Center by seeking the three one million dollar payments in the Contract. Because of the relationships between the parties - in particular Gallo's involvement with TFF, ASFF, and Feinstein - Gallo thought he could assist in resolving the dispute.  See Gallo Dep. 249-250, Jan. 31, 2005.  Furthermore, RIF conducted "a meeting or a series of meetings" in an attempt to resolve the dispute.  Gallo Dep. 42, Jan. 24, 2005.  Feinstein himself had discussed the Contract dispute with Gallo.  See Id. 37-42.  And Feinstein had instructed Brown, in a letter, that "further communication about this matter should go direct to them. (Ron Gallo)."  Def.'s Ex. 18.  Thus, Brown's action — seeking assistance from Gallo at RIF to resolve the Contract dispute — was justified and not for an improper purpose.

Finally, factor (f) focuses on the proximity of Brown's conduct to the dissolution of RIF's relationship with Feinstein and TFF.  Feinstein and TFF argue that Brown "put a quick end to the relationship."  Pls.' Mem. at 26.  Brown contends that he intended no harm to the relationship because to do harm "could only be

---

[15] As discussed above, this Court has concluded that the Letter was sent to protect Brown's financial interests.

22

counterproductive to [Brown's] effort" to have RIF assist in resolving the Contract dispute. Def.'s Mem. at 20. Viewing these facts in the light most favorable to Feinstein and TFF, Brown's conduct arguably played a role in the dissolution of the relationship between Feinstein, TFF, and RIF. However, this one factor is not enough to raise a genuine issue of material fact as to whether Brown acted with "legal malice."

Even taking the facts in the light most favorable to Feinstein and TFF, and applying the Restatement factors, it is pellucid that Brown did not have "an intent to do harm without justification." Mesolella, 508 A.2d at 670. Unable to prove this essential element of the tortious interference claim, Feinstein and TFF cannot prevail on this count. Therefore, Brown is entitled to summary judgment.[16]

C.  <u>Breach of Contract</u>[17]

A breach of contract claim requires the existence of a contract, a breach, and damages. <u>Petrarca v. Fidelity & Cas. Ins. Co.</u>, 884 A.2d 406, 410 (R.I. 2005). Here, it is undisputed that a contract exists and Brown appears to concede that there are

---

[16] Accordingly, this Court need not reach Brown's additional argument that neither Brown nor the Letter caused any legally cognizable harm.

[17] Feinstein and ASFF claim that Brown breached. Brown, of course, also has a breach of contract claim against Feinstein and ASFF, which is part of this litigation. Brown's breach claim is not the subject of the pending motions.

damages.[18] Thus, the question is whether Brown breached the Contract. Brown contends that there are no facts which could support a finding that he breached, while Feinstein and ASFF point to multiple Contract provisions under which there are genuine issues of material fact regarding Brown's performance.

"Where the language of a contract is clear and unambiguous, the Rhode Island Supreme Court has generally interpreted the parties' intent based solely on the written words," and accord unambiguous words their "plain and natural meaning." In Re: Newport Plaza Assocs., L.P., 985 F.2d 640, 645 (1st Cir. 1993). If there are no ambiguities in a contract, summary judgment may be "an appropriate vehicle for resolving contract-interpretation disputes." Id. at 644. Under Rhode Island law, contract language is "ambiguous when and if it is 'reasonably susceptible of different constructions.'" Id. at 645 (quoting Westinghouse Broad. Co., Inc. v. Dial Media, Inc., 410 A.2d 986, 991 (R.I. 1980)). If this Court finds an ambiguity, then "the construction of that provision is a question of fact." Fryzel v. Domestic Credit Corp., 385 A.2d 663, 666 (R.I. 1978). An ambiguity that creates a genuine issue of material fact, therefore, precludes summary judgment.

---

[18] Brown did not argue that the lack of damages entitles him to summary judgment. Furthermore, he noted the "$7,000 supposedly sent to the Center through an intermediary," see Def.'s Mem. at 22, and he stated that "I don't contest Mr. Feinstein's position" regarding the $7,000. Brown Dep. 353.

1. <u>Celebrity Involvement</u>

Feinstein and ASFF aver that a genuine issue of material fact exists regarding Brown's contractual obligation to secure celebrity involvement.  Feinstein and ASFF contend that Brown was required to put on "celebrity challenges" — a term that they contend means that Feinstein's challenge to donate money should have been posted to individual celebrities.[19]  Brown admits that he did not put on "celebrity challenges" in this sense, but responds that since the term "celebrity challenges" appears nowhere in the Contract, he was not required to do so.

The Contract actually required "challenge grants," a term that is undefined in the Contract.  Feinstein describes a "challenge grant" as a fundraising vehicle whereby Feinstein permits the use of his name in an effort to challenge potential donors to give money for a charitable purpose while Feinstein agrees to provide matching donations, up to a specified maximum amount.[20]  Hr'g Tr.

_____

[19] Feinstein and ASFF also point to several Contract provisions discussing celebrity involvement.  For example, the Contract required Brown "to utilize celebrity interest" and to work with the End Hunger Network.  Contract ¶ 3.  The Action Plan specified the following celebrity involvement:  (1) "Child celebrities testify before Congress"; (2) "Celebrities on talk shows"; (3) "Recruit 20 'state celebrity ambassadors'"; (4) "Sports and entertainment celebrities to meet with the President"; (5) "Celebrity events"; (6) "Celebrities read favorite stories on tape for kids"; and (7) "Celebrity media events."

[20] Feinstein maintains that the "Feinstein Challenges are renown for their success in raising money for anti-hunger programs, and have been responsible for raising hundreds of millions of

at 53-54, Sept. 16, 2005.  However, Brown disagrees with this
meaning for the term "challenge grant" and maintains that he
satisfied his obligations under the Contract.[21]

Brown did not challenge individual celebrities to make
personal donations, as Feinstein envisioned he would.  Rather,
Brown worked in collaboration with the End Hunger Network to secure
a three million dollar corporate pledge from Unilever/Lipton.
Brown contends that this corporate pledge fulfills the Contract's
requirement of "'challenge grants' to the End Hunger Network."
Contract ¶ 6.

However, this three million dollar corporate pledge was for
support of another national anti-hunger campaign that Brown helped
to develop.  Though distinct from the national campaign discussed
in the Contract with Feinstein and ASFF, Brown claims that the
national campaign for which he and the End Hunger Network received
the three million dollar pledge encompassed all component parts and
elements of the Contract's national campaign.[22]

_____

dollars for participating charitable organizations."  Pls.' Mem. at
2.

[21] Brown also points to Contract language separating
Feinstein's obligation to pay from Brown's success in raising
money.  This language is irrelevant, however, because Feinstein
attacks the means by which Brown raised money, not the end result.
Here, the question is whether Brown followed the Contract's
dictates regarding how to raise money.

[22] In addition, Brown maintains that even though "only a third
of the [Unilever/Lipton] funds directly or indirectly benefitted
the Center itself," Brown did not "violate any provision of the

26

The term "challenge grants," a critical term in the Contract, is ambiguous on its face and undefined in the Contract. This Court finds the term reasonably susceptible to different meanings, as evidenced by the various meanings proffered by the parties. <u>See</u> <u>Newport Plaza</u>, 985 F.2d at 645. The meaning of the term "challenge grants," and the question of whether Brown's corporate pledge met his obligation or breached the Contract's requirement, therefore, must be left to a jury.

### 2. <u>Naming rights</u>

Finally, Feinstein and ASFF point to Brown's alleged noncompliance with the naming rights provision in the Contract as another genuine issue of disputed material fact that precludes summary judgment. The Contract provided that at Feinstein's discretion, the Center "will be named after Alan Shawn Feinstein" and "[a]ny other name associated with the Center shall require the concurrence of both Feinstein and Brown." Contract ¶ 10. The Contract also declared that "[s]uch naming opportunity shall remain available to Feinstein whether or not Brown's program remains at Tufts University or moves to another non-profit institution, to be decided by Brown." <u>Id.</u>

Feinstein submits that the Contract's naming provision gave him the expectation that his name would remain permanently on the

---

Contract." Def.'s Mem. at 11.

Center.  Brown points out that the Contract is silent on whether the Feinstein name for the Center would survive in perpetuity, but he also claims that he sent Feinstein a proposal to permanently name the Center for Feinstein.[23]

Subsequent to the execution of the Contract, Brown relocated from Tufts to Brandeis, entering into a formal agreement with Brandeis on June 2, 2000.[24]  Brandeis' policy required a minimum contribution of five million dollars in order to secure "a permanent naming."  Shonkoff Dep. 41, June 24, 2005.  The Contract, however, set forth donations totaling three million dollars and included a naming opportunity for the Center, regardless of its location or affiliation.  See Contract ¶ 10.  Pursuant to Brandeis policy, Feinstein was two million dollars short of the amount required to permanently affix his moniker to the Center.  Brown admits that he tried, albeit unsuccessfully, to get an additional two million dollar bequest from Feinstein (in the form of an

---

[23] Brown provides an exhibit to this effect: a note Brown claims he faxed to Feinstein, which stated that the decision to name the Center for the lesser three million dollars pledged would be in Brown's discretion.  Def.'s Ex. 32.  However, the note did not specify whether the naming of the Center for three million dollars would be in perpetuity or for some specified time period.  Id.

[24] The first page of the agreement between Brown and Brandeis provides that the Center's name "will be mutually determined by Brown and the Dean of the Heller School, subject to the approval of the [Brandeis] Provost and [Brandeis'] Senior Vice President for Academic Affairs."  Pls.' Ex. 29.

endowment), in order to achieve the five million dollar contribution level.

Because Feinstein anticipated permanence in his naming opportunity for the Contract amount of three million dollars, and because he maintains that naming rights to institutions are always permanent, unless otherwise stated, Feinstein claims that Brown's association with Brandeis (and its concomitant policies) constituted a willful breach of the Contract. Viewing these facts in the light most favorable to Feinstein and ASFF, as this Court must, the Contract's silence regarding the duration of the naming right is an important ambiguity precluding determination of whether or not Brown breached. Therefore, resolution of this ambiguity is a question for the jury.

Because both the meaning of the term "challenge grants" and the duration of the naming right are unclear and ambiguous, summary judgment on the breach of contract claim must be denied.[25]

IV. Conclusion

For the foregoing reasons, Brown's Motion for Summary Judgment is GRANTED as to Count I, Defamation, and Count II, Interference

---

[25] In light of this holding, additional arguments by Feinstein and ASFF need not be decided.

with Advantageous Business Relations, and DENIED as to Count III,

Breach of Contract.


IT IS SO ORDERED.



_____
William E. Smith
United States District Judge
Date:  5/11/06